Luola McCormick LOVE and husband Charles Love; Dougald Stuart McCormick; Rachael McCormick Brooks and husband Thomas Brooks, Plaintiffs,

v.

UNITED STATES of America; State of North Carolina; Dunbar Corporation; McCauley and McDonald Investments, Inc.; Beskind and Rudolph, P.A. and David S. Rudolph; Southern National Bank of North Carolina and Ervin I. Baer, Trustee; Quick Stop Food Mart, Inc. and Albert McCauley and Kenneth McDonald, a Partnership; and CSX Transportation, Inc., Defendants.

No. 88–100–CIV–3–H.

United States District Court, E.D. North Carolina, Fayetteville Division.

June 10, 1994.

**1549**

William E. Clark, John G. Shaw, Clark, Shaw, Clark, Lingle & Clark, Fayetteville, NC, for plaintiffs.

Paul Newby, Asst. U.S. Atty., Raleigh, NC, for defendant No. 1.

John F. Maddrey, Asst. Atty. Gen., N.C. Dept. of Justice, Raleigh, NC, for defendant No. 2.

Mark A. Sternlicht, Beaver, Thompson, Holt & Richardson, Fayetteville, NC, for defendants Nos. 3–11.

Charles B. Neely, Jr., Gilbert C. Laite, III, Maupin Taylor Ellis & Adams, P.A., Raleigh, NC, for defendants Nos. 12 & 13.

Table of Contents

Introduction — page 1550
Background — page 1550
September 28, 1991 Memorandum and Recommendation — page 1553
  A. Motion to Strike — page 1553
  B. Motion for Additional Discovery — page 1554
  C. Dunbar's Motion to Dismiss All Remaining Claims for Relief — page 1555
    1. Subject Matter Jurisdiction Under the Quiet Title Act — page 1555
    2. Actual Controversy — page 1556
    3. Collusion — page 1556
    4. Unjust Enrichment — page 1556
    5. Injunctive Relief — page 1556
    6. Collateral Attack — page 1557
    7. Equitable Relief — page 1557
  D. Summary and Order — page 1557
March 31, 1992 Memorandum and Recommendation — page 1557
  1. Assumptions by the Magistrate Judges — page 1559
  2. Effect of State Condemnation Action — page 1560
    A. Collateral Estoppel against Dunbar — page 1560
    B. Dunbar's Entitlement to the Condemnation Proceeds — page 1562
  3. Statute of Frauds — page 1564

| | | |
|---|---|---|
| 4. | Rule Against Perpetuities | page 1565 |
| 5. | United States' Claim of Title | page 1566 |
| 6. | Equitable Title | page 1567 |
| 7. | Delay in Recording the 1853 Documents | page 1567 |
| 8. | Waiver and Abandonment | page 1573 |
| 9. | Statutes of Limitations and Laches | page 1574 |
| 10. | Adverse Possession | page 1575 |
| 11. | Nature of the 1853 Documents and the Interest of the Railroad | page 1576 |
| 12. | Remaining Issues, Injunctive Relief and Interlocutory Appeal | page 1581 |
| | Summary and Order | page 1582 |

## ORDER

MALCOLM J. HOWARD, District Judge.

This matter is before the court upon objections to Memorandum and Recommendation dated September 28, 1992, and Memorandum and Recommendation and Order of March 31, 1992, entered by United States Magistrate Judges Charles K. McCotter, Jr., and Wallace W. Dixon. All remaining parties have filed objections and, in several instances, responses to objections. The matter has also been heard at oral argument. Several factors have delayed a decision in this matter including, the voluminous nature of the file, the number of issues and their complexity, and the press of other business. Nevertheless, the time for ruling has arrived.

## BACKGROUND

This is an action to quiet title to real property in Cumberland County, North Carolina. Jurisdiction is found in 28 U.S.C. §§ 2409a, 1346(f) and 1345. The property in dispute was a former railroad right-of-way which was operated by Seaboard Systems Railroad (Seaboard), and both its predecessors and successors in interest, including CSX Transportation, Inc. (CSX). Seaboard abandoned service over this property in 1979. As framed by the initial pleadings, a number of parties, including the United States, claim title to all, or portions of, the disputed property. While a number of these claims have been resolved, disputes remain as to some portions of the property. The remaining parcels are those that have been the subject of a pending state court condemnation action, and a small parcel located at the southern end of the disputed tract.

The property that forms the basis of this action is a strip of land approximately 80–100 feet wide and running in a northwest-south-east direction. The Fort Bragg Military Reservation borders the strip along the southwest. For over 135 years the property has been used for a single set of railroad tracks. Railroad use began on the property following the execution of certain documents by Duncan Murchison and Duncan McCormick in 1853. These individuals were adjacent landowners, with Murchison's lands being to the northwest of McCormick's. The documents are essentially identical in form, both sealed, witnessed, and signed by Murchison and McCormick, respectively. The documents recite:

> For and in consideration of ONE DOLLAR, cash in hand paid, it is by this agreement witnessed that the undersigneth doth contract to grant and convey unto the WESTERN RAIL ROAD COMPANY, in case the said Company shall locate their Road through or upon the lands of the undersigned, a sufficient quantity of land for that purpose, viz.: a strip of land not exceeding 50 feet wide (40 feet wide in the Murchison document), on each side, measuring from the centre of the Road bed. The conveyance of the lands to be made upon demand, after the actual location is traced out or determined upon.

Neither of these documents was recorded in the Cumberland County Registry until 1981. The magistrate judges found that pursuant to these documents, the railroad entered onto the lands of Duncan McCormick and Duncan Murchison and established its track prior to August 18, 1872, and that the Western Railroad and its successors in interest, including Seaboard, made exclusive use of this property until 1979, and possibly until 1984.

In 1979, in a proceeding before the Interstate Commerce Commission (ICC), Sea-

board abandoned railroad service over a 3.52–mile portion of its line. The disputed property was a part of this larger abandonment. Following the abandonment, the railroad removed its tracks, except for two side tracks and a switch connecting a spur track serving Fort Bragg to the main track, located at the extreme southeastern end of the disputed strip. Following ICC proceedings, Seaboard conveyed a section of the abandoned right-of-way to Dunbar Corporation (Dunbar) through a quitclaim deed, dated September 10, 1984, and recorded in Book 3042, page 111, Cumberland County Registry. Upon receiving the deed from Seaboard, Dunbar made out-conveyances to several other parties; the most significant of which were to McCauley and McDonald Investments, Inc. (McCauley and McDonald). Three parcels were conveyed to McCauley and McDonald; of which only one remains in dispute, a ".46–Acre tract" located at the southern end of the subject property.

The North Carolina Department of Transportation (DOT) commenced a condemnation action of two parcels at the northeastern end of the property for a highway project by the filing of a complaint with a declaration of taking and notice of deposit, pursuant to N.C.Gen.Stat. § 136–103, on August 17, 1984, in the Superior Court of Cumberland County. Dunbar was named as a party claiming an ownership interest in the property. The heirs of Duncan Murchison were added as parties to the state action; and by a deed dated April 3, 1986, recorded in Book 3155, at page 671, of the Cumberland County Registry, the Murchison heirs quitclaimed their interest in the condemnation property to Dunbar. The instrument also assigned to Dunbar the Murchison heirs' interest in any condemnation award.

On May 5, 1986, the State sought to add the United States as a party claiming an interest in the subject property. The action was removed to this federal court by the United States. On October 20, 1986, United States District Judge Terrence W. Boyle entered an order dismissing the action against the United States for lack of subject matter jurisdiction. It was determined that the exclusive jurisdiction for actions to quiet title resides in the federal court, that the state court lacked jurisdiction to adjudicate title to property claimed by the federal government, and that the federal court had no such jurisdiction within the confines of a removed case. *Department of Transportation v. Seaboard System Railroad Corp., et al.*, No. 86–45–CIV-3 (E.D.N.C. October 20, 1986).

In the state court action, Superior Court Judge Coy Brewer held that the state, through the Department of Transportation and acting as a condemnor exercising the power of eminent domain, could not assert title to the property in the context of a condemnation proceeding. This assertion of title had been based on the principles of escheat to the state, or through an inability to establish a chain of title. Judge Brewer then found that, as between those parties properly before the court and asserting an interest in the contested property as of the date of taking, the Murchison heirs had superior title. Judge Brewer did not determine the quality of the State's claim, nor that of any party not before the state court, and only determined the quality of the claim of Dunbar through both Seaboard and the Murchison heirs. He then decreed that Dunbar, through its acquisition of the interest of the Murchison heirs, was a party properly before the court with superior title to the property taken in the condemnation action. *Department of Transportation v. Seaboard Systems Railroad, Inc.*, No. 84–CVS–3367 (Order of 22 June 1988). This decision was affirmed on appeal, and the issue of damages for the taking was returned to the Cumberland County Superior Court for trial. However, by an order of November 6, 1991, this court stayed the state court action pending resolution of the title disputes at issue in the present action.

In this action, the United States originally cross-claimed as to all named defendants, asserting that it was the owner of the entire parcel of disputed property. Dunbar and McCauley and McDonald cross-claimed against the United States, the State of North Carolina, and CSX. Dunbar and CSX have settled, and both Dunbar and the United States have dismissed their cross-claims against CSX. Dunbar, the United States,

and the State of North Carolina (the State) have settled all issues between them, with the exception of the claims relating to the condemnation property. Dunbar's interest on this point, however, is solely an assertion that it is entitled to the proceeds in the state condemnation action. It makes no claim to present title in this parcel. Also remaining for disposition are McCauley and McDonald's cross-claim against CSX, and cross-claims between McCauley and McDonald and the United States against each other, concerning title to the ".46 Acre" tract at the southern end of the originally disputed property.[1] The State of North Carolina has dismissed any claim to this tract.

In its cross-claim, the United States requests the court to find that the United States is the owner of the fee simple absolute title to the property and that the other defendants have no right, title, or interest in the land. Through summary judgment, the United States seeks relief on the merits of the quiet title action. Also, the United States seeks summary judgment against Dunbar as to any claim that Dunbar may have to the state condemnation proceeds. In its motion against the State, the United States seeks to quiet title in its favor and requests that the federal court require the State to dismiss with prejudice the pending condemnation action in state court. The United States is the only party seeking a declaration as to the ownership of the condemnation property.

The United States' position has been that the railroad merely possessed an easement for railroad purposes which was extinguished upon abandonment of the right-of-way. Thus, the railroad had no interest to convey to Dunbar. The United States claimed the strip of land for its entire width as an adjoining landowner of an abandoned right-of-way. This claim is founded on both the common law and N.C.GEN.STAT. § 1–44.2. Additionally, the United States claimed it acquired title to the underlying fee by several conveyances beginning in 1918.

The United States contends that Dunbar, as the purchaser from the railroad, did not receive any interest under the purported 1853 contracts and that the contracts are void and unenforceable. Even if the contracts were enforceable, the specific terms provide for an easement, not a fee. Even if the contracts were originally enforceable and provided for a fee, these documents are outside the chain of title and unenforceable against the current owners. Furthermore, it is contended that the Murchison heirs had no title to the northern portion of the subject property because their predecessors had previously conveyed their entire interest. The United States asserts that it is the owner of all of the subject property formerly owned by the Murchisons.

For Dunbar's purposes, the only property that remains in dispute is that portion of the former railroad property that was the subject of the state condemnation action. Dunbar no longer claims a title interest in this property, but only an interest in the condemnation proceeds. It is the position of Dunbar that the title to the condemnation tracts vested in the State on August 17, 1984, pursuant to the condemnation proceedings. However, the contract to purchase between Dunbar and Seaboard was recorded prior to, and Seaboard quitclaimed its entire interest in the property to Dunbar following, the date of condemnation. Dunbar bases its entitlement to the proceeds on four theories.

First, Dunbar claims that the Western Rail Road Company received at least equitable title, with the right to compel the execution and delivery of a deed to the property when, pursuant to the 1853 agreements with Duncan Murchison and Duncan McCormick, the company built a railroad on the property. Thus, when Seaboard sold to Dunbar, Dunbar received at least equitable title and the right to receive a deed. Second, Dunbar claims the railroad had acquired the property under seven and twenty years' adverse possession. Third, Dunbar contends that the United States should be estopped from contesting Dunbar's title as derived from the

---

1. In an order of February 28, 1992, this court adopted the magistrate judges' recommendation of November 8, 1991 and found that CSX was entitled to summary judgment on its claim that it held an easement for railroad purposes over this parcel.

railroad, because prior to Dunbar's receiving the deed from Seaboard the United States had never asserted any claim in the property and had informed both Seaboard and Dunbar that it had no interest in the property. Finally, Dunbar claims the condemnation proceeds through the quitclaim deed received in the state condemnation action from the Murchison heirs.

While the State denies the United States' claim to the condemnation property, it does not oppose the United States' renewed motion for summary judgment. The State has denied Dunbar's claims to ownership of the property. The State has asserted title based upon the statutory presumption in N.C.GEN. STAT. § 146–79, premised upon its inability to determine any valid record title of the subject property. Furthermore, the State contends that pursuant to N.C.GEN.STAT. § 136–104, title to the land specified in the condemnation complaint vested in the Department of Transportation on August 17, 1984, and that the right to just compensation vested in any person owning the property at that time. McCauley and McDonald claim ownership in the .46–acre tract through their deed from Dunbar and thus are aligned in interest with Dunbar to the extent this action affects this tract.

### SEPTEMBER 28, 1991, MEMORANDUM AND RECOMMENDATION AND ORDER

In the magistrate judges' Memorandum and Recommendation and Order (M & R) of September 28, 1991, the following motions were considered: Dunbar's Motion to Strike and in the Alternative Motion for Additional Time for Discovery and to Respond, filed July 1, 1991, and Dunbar's Motion to Dismiss All Remaining Claims for Relief, filed July 1, 1991. The magistrate judges denied the motions to strike, for discovery and further response and recommended denial of the Motion to Dismiss.

### A. *Motion to Strike*

Dunbar filed a motion to strike the United States' renewed motion for summary judgment and, alternatively, for additional discovery and response time. Dunbar contends that the United States' renewed motion seeks relief not sought in its counterclaim, including ordering the State to dismiss with prejudice the state court condemnation action, declaring that the United States owned the condemnation tracts as of the date of the condemnation, and ordering a constructive trust in favor of the United States on any proceeds obtained by Dunbar in the state court action. Dunbar first contends that the federal court is without jurisdiction under § 2409a to allow the United States to collaterally attack the state condemnation award, or to grant any relief other than declaring that the United States is the *present* owner of the property. Second, Dunbar says that the pleading is both redundant, and of a type not contemplated by the Federal Rules of Civil Procedure. Third, Dunbar contends that the renewed motion sought indirectly to amend the cross-claims. Fourth, Dunbar contends that the United States cannot assert ownership of the property at a certain time in the past on the basis of its cross-claim.

■ The magistrate judges recognized that the renewed motion for summary judgment was an attempt to amend the pleadings. While Dunbar may be correct that such a procedure is somewhat irregular, any such irregularity was cured by allowing both the United States and the State of North Carolina to file more formal amendments. The magistrate judges noted that Fed.R.Civ.P. 15 promotes liberality in the amendment process. Nor is there any apparent prejudice to Dunbar by allowing such an amendment. In this regard, this court is not persuaded by Dunbar's apparent contention that an assertion of past ownership by the United States works a dramatic change in the nature of this action. The theories of ownership asserted by the United States obviously stand for the proposition that it owned the property prior to the date of the state condemnation action. Nor has Dunbar's claim of ownership been materially changed. In the interests of justice the amendments are appropriate, Dunbar's objections are overruled, and the magistrate judges' ruling as to the motion to strike is affirmed.

## B. *Motion for Additional Discovery*

Dunbar objects to the M & R's finding that the government's renewed motion for summary judgment does not raise any factual issues, especially any which require the deposition of government counsel, Paul Newby. Dunbar contends that the renewed motion for summary judgment raises for the first time the issue of who owned the condemnation tracts as of the date of the condemnation, August 17, 1984. However, as previously discussed, this is not a new issue.

Dunbar states that it has never claimed ownership in the condemnation tracts in this action, but only an entitlement to the proceeds in the state action. Dunbar does contend that it was the owner of the property as of August 17, 1984. The United States asserts title to the property, and also claims an interest in the proceeds of the state condemnation because of its funding of those proceeds. Dunbar's requested discovery is not tailored toward the United States' interest in these proceeds.

Dunbar wishes to depose government's counsel, Paul Newby, who testified as an expert witness in the state trial proceedings. Dunbar also asserts that during the state condemnation action it was able to discover and review certain documents which contradict the present position of the United States, that it has always asserted ownership of the condemnation tracts and asserted ownership of the condemnation tracts on or before August 17, 1984. These documents may lead to the admissibility of relevant testimony favorable to Dunbar as to certain of the title questions.

Dunbar has filed a joint affidavit from attorneys Ronald E. Winfrey and Steven J. O'Connor, who represented Dunbar in the state action. Winfrey and O'Connor recount various aspects of the state action, and have attached exhibits in support of their contention. These include an answer filed by Newby, on behalf of the United States, that the state could condemn an easement over federal lands; various representations by Newby that the United States and the DOT were working together; and his state court testimony that the United States owned only the land to the west of the center line of the railroad right-of-way.

Following Newby's testimony in the state action, he permitted Winfrey and O'Connor to review materials contained in his files during a court recess. After the recess, however, Newby refused further examination of the files. Winfrey and O'Connor aver that the materials viewed included correspondence between Newby and the Corps of Engineers concerning the possibility of a quiet title action to the property; expressing doubt that the United States could prevail in such an action; expressing uncertainty over who actually owned the property; and, the legal significance of various deeds and other instruments involved in this action. There was also correspondence between Newby and counsel for the DOT discussing trial strategy, and the attempt to time the dismissal of the federal action in order to calendar the state action before a state judge who was felt to be favorable to the DOT's position.

The court has serious reservations as to whether it was appropriate for Newby to enter an appearance in the state action as an "expert witness." His appearance in the state action occurred at a time when he should have known that the United States had a claim to the property, even if its precise nature was indeterminate. Furthermore, it is readily apparent that such actions, even if technically permitted, provide potential fodder for Dunbar's argument of collusion between the state and federal governments.

Despite such reservations, this does not mean that Dunbar is entitled to depose Newby, or examine the documents allegedly contained in his files. For the purposes of this motion, the court accepts that the United States has not always asserted an ownership interest in the entire right-of-way property, and that government officials may have been uncertain as to the strength of the United States' claim; although, in its answer to the amended complaint of taking, the United States claimed that it was the sole owner in fee simple of the condemnation property. However, this does not preclude the United States from now coming forward and asserting that it has owned the property at rele-

vant times in the past, including the date of the state condemnation.

■ As will be discussed further, the ownership of the property is determined by analyzing the nature of the 1853 documents, and their legal significance. Ultimately either the United States, the State, or Dunbar, actually owned the property on the date of the condemnation. In the context of this action, and particularly when dealing with the federal government, it does not matter whether the true owner actually realized the fact of its ownership. In this light, Dunbar's request for discovery as to the opinions of Newby, or other government officials, would be relevant only to the issue of estoppel. The issue of estoppel against the government was explored at length in the March 31, 1992 Memorandum and Recommendation. It is enough to say here that any such representations or opinions of federal agents or employees, will not deprive the federal government of an interest to real property.

Dunbar's objections are overruled, and the magistrate judges' ruling on the motion for additional discovery is affirmed.

C. *Dunbar's Motion to Dismiss All Remaining Claims for Relief*

Dunbar's motion to dismiss challenges the jurisdiction of the federal court to the extent that the United States expands upon its remedial request in its renewed motion for summary judgment. The United States responds that the court has jurisdiction under the Quiet Title Act to consider the question of the ownership of the land subject to the state condemnation. The United States also contends that it would be unjust to allow Dunbar to receive the proceeds for the taking of property that it did not own.

1. *Subject Matter Jurisdiction Under the Quiet Title Act*

■ The M & R found federal court jurisdiction under 28 U.S.C. §§ 2409(a) and 1346(f), which confer jurisdiction over title disputes involving property interests of the United States, and also under 28 U.S.C. § 1345 as providing an additional source of jurisdiction where the United States is a plaintiff. Dunbar contends that, since the original complaint against the United States has been settled, the court no longer has jurisdiction under the Quiet Title Act of the United States' cross-claims against the other defendants. As the magistrate judges correctly observed, §§ 1346(f) and 2409a provide a broad basis for jurisdiction. *Monroe Sav. Bank, FSB v. Catalano,* 733 F.Supp. 595, 597 (W.D.N.Y.1990). There still remains a dispute between the United States and the State as to the title of the property. Therefore, the settlement of the original plaintiffs' claim does not deprive the court of jurisdiction over the cross-claims.

Dunbar next contends that the United States has not offered any evidence that it will have to pay eighty per cent (80%) of any condemnation award in the state action. In the M & R the court was not considering the sufficiency of the evidence—merely whether to allow a motion to amend. The United States has provided a copy of a Federal Aid Project Agreement executed on March 31, 1983 between the DOT and the United States Department of Transportation Federal Highway Administration, appearing to cover the subject property. Reply of the United States to Response of Dunbar Corporation to Motion for Summary Judgment Against the State of North Carolina and Renewed Motion for Summary Judgment Against Dunbar Corporation, Exhibit A.

This agreement has been amended on several different occasions. Both the original agreement and subsequent modifications indicate that federal funds will constitute approximately eighty per cent of the total stated project amount. However, the agreement does specify that the federal funds obligated are not to exceed the amount shown by its terms. Paragraph 8 of the Agreement Provisions states that the it does not create a present or immediate obligation against federal funds. While the precise role of this agreement in funding the condemnation proceeds is unclear, this submission refutes Dunbar's claim that the government's contention is nothing more than a bald conclusion.

Dunbar also contends that it is irrelevant whether the United States will have to fund

eighty per cent of the condemnation award, since Dunbar was not a party to any agreement between the United States and the State of North Carolina. Dunbar's argument attempts to create a Catch–22 situation in which the state court was without jurisdiction to determine the superiority of the United States' title, and awarded the proceeds to the only remaining party properly before it, yet that award cannot be questioned in this court which does not face such a jurisdictional barrier. Furthermore, the United States would have to pay a substantial portion of an award to a party who may not properly be entitled to it. Dunbar contends that the limited jurisdiction of the Quiet Title Act does not provide a jurisdictional basis upon which to resolve the dispute over the award of proceeds. However, even if jurisdiction were limited under the Quiet Title Act, § 1345 provides the additional jurisdictional basis. Dunbar's jurisdictional objections are overruled.

#### 2. *Actual Controversy*

■ Dunbar objects to the findings and conclusions of the Memorandum and Recommendation that there was an actual controversy as to the ownership of the condemned property, that the true owner of the property at the time of the filing of the state condemnation action is entitled to the proceeds, that if the land involved in the state condemnation action is owned by the United States there is no jurisdictional basis for the state action, that the United States' claim of ownership creates a controversy as to the title of the land, and in the determination of the proper party to receive the state land condemnation proceeds. Dunbar says that the United States does not have standing to contend that Dunbar will be unjustly enriched by the award of condemnation proceeds paid to it by the Department of Transportation in the state action. This court concludes that the government's alleged interest in these proceeds provides such standing. This objection is overruled.

#### 3. *Collusion*

Dunbar objects to the court's conclusion that the United States is entitled to have its title and ownership interest resolved in a quiet title action in federal court. Dunbar complains that the United States and the State of North Carolina have been aligned in interest. As previously discussed, this seems to be true. However, the fact that the United States claims ownership to the property does make the positions of the respective sovereigns adverse. Moreover, neither the fact that the United States is agreeable to the State's construction of a road, or the alignment in interest of both governments in ascertaining that the condemnation proceeds are paid to the true owner, amounts to collusion. This objection is overruled.

#### 4. *Unjust Enrichment*

Dunbar objects to the findings and conclusions indicating that the United States *may* have a claim for unjust enrichment in the nature of "money had and received," and granting the United States and the State of North Carolina leave to amend the pleadings to allege against Dunbar any such claims for relief as to the state condemnation proceeds. Dunbar objects to this because of lack of evidentiary support of the United States' claim that it funded eighty per cent of the condemnation proceeds. The M & R makes no determination of the evidentiary value of the allegation and merely allows amendment to pursue these claims. Furthermore, the United States has presented some evidence that it will pay a percentage of the project costs. Dunbar is free to challenge the legal significance of this agreement and the sufficiency of the evidence to support the claim as the matter progresses. Dunbar's objections are overruled.

#### 5. *Injunctive Relief*

Dunbar objects to the court's findings and conclusions as to injunctive relief. Essentially, Dunbar says that the state action has gone to final judgment on the issue of entitlement to the condemnation proceeds and awarded them to Dunbar. The magistrate judges found that no final judgment has been entered pursuant to N.C. GEN. STAT. § 136–116 and that the state proceeding is still ongoing. The federal district court can fashion injunctive remedies to enforce its

judgments and, should the United States be determined to be the owner of the property, to remove any cloud on its title. Dunbar's objections are overruled.

### 6. Collateral Attack

■ Dunbar objects to the conclusion that the United States is not attempting a collateral attack of the state court judgment. The M & R noted that state court judgments are required to be given full faith and credit by federal courts under 28 U.S.C. § 1738. However, it also stated that the judgment may be open to attack as being void for lack of jurisdiction. Both propositions are correct. Furthermore, since the United States was not a party to the state action and therefore had no opportunity to litigate its title claim, it is not barred by principles of collateral estoppel or res judicata. These objections are overruled.

### 7. Equitable Relief

The M & R correctly found without merit Dunbar's argument that the United States is not entitled to equitable relief because of laches and unclean hands. Dunbar's objection to this finding is overruled.

### D. Summary and Order

Upon reviewing the pleadings and memoranda of the parties and the memorandum and recommendation of the magistrate judges filed September 28, 1991, this court finds that the memorandum and recommendation is in all respects proper and in accordance with the law. Having found no error in the findings and conclusions of the magistrate judges, the court hereby adopts the memorandum and recommendation of the magistrate judges entered on September 28, 1991, as its own. Therefore, this court hereby DENIES Dunbar's Motion to Dismiss All Remaining Claims for Relief and AFFIRMS the magistrate judges' denial of Dunbar's Motion to Strike and in the Alternative for Additional Discovery and Response Time.

### MARCH 31, 1992, MEMORANDUM AND RECOMMENDATION

In the March 31, 1992, memorandum and recommendation (M & R) the magistrate judges ruled on the following motions: United States Motion for Summary Judgment Against Dunbar, filed June 30, 1989; Dunbar's Motion for Summary Judgment Against the United States, filed January 6, 1990; CSX's Motion for Summary Judgment Against McCauley and McDonald, filed March 26, 1990; United States' Renewed Motion for Summary Judgment Against Dunbar, filed June 13, 1991; and United States' Motion for Summary Judgment Against the State of North Carolina, filed June 13, 1991.

The magistrate judges determined that: (1) this action is not barred by principles of res judicata or collateral estoppel; (2) the United States is not estopped from disputing Dunbar's claims; (3) the 1853 documents were option contracts which became contracts to convey when the railroad elected to exercise the options by the placement of its tracks, thus completing performance of its obligations under the contract to convey; (4) the 1853 documents became contracts to convey land in fee simple absolute, giving the railroad an equitable fee; (5) the United States has standing to contest the enforceability of the 1853 documents; (6) the 1853 documents do not violate the statute of frauds or the rule against perpetuities; (7) the railroad's failure to register the 1853 contracts did not deprive it of its equitable interest; (8) neither laches or statutes of limitations operate to deprive the railroad, Dunbar, or McCauley and McDonald of their interest in the property; (9) the evidence did not support summary judgment for the United States based on waiver or abandonment; (10) the railroad adversely possessed the property so that it could pass perfect title to Dunbar by the 1984 quitclaim deed; and, (11) the United States does not own any interest in the subject property.

It was recommended that the United States' motion for summary judgment be denied; that Dunbar and McCauley and McDonald be granted summary judgment that the United States owns no interest in the property and that the railroad conveyed perfect title to Dunbar by the 1984 quitclaim deed; that the title to the condemnation tracts be quieted in the State of North Car-

olina pursuant to N.C.Gen.Stat. § 136–104, and the complaint and declaration of taking in the state condemnation proceedings; that the rights of just compensation for land acquired by the State of North Carolina vested in Dunbar at the time the complaint and declaration of taking were filed in the state condemnation action, August 17, 1974; that the injunction as to the state condemnation action be lifted; and, that as to the ".46–Acre Tract," further ruling be reserved pending resolution of the factual dispute concerning whether the deed from Seaboard to Dunbar conveyed this property.

While the M & R discusses a number of areas, and at considerable length, its basic proposition can be fairly simply distilled. It is based on the determination that the 1853 contracts were for the conveyance of a fee interest in the subject property. The railroad thereby obtained equitable title to the property. Upon full performance under the contract, by laying the track and occupying the property, its possession became adverse as to all others, including the original owners. Occupying the property for the requisite statutory period(s) transformed the equitable title into a legal title, albeit an unrecorded one. Thus, the focus here is primarily on the concept that a fully performed contract, accompanied by possession of the subject property ultimately results in a "perfection of title." Put differently, while the successors in interest to Duncan Murchison once held a naked legal title, they were disseized of this interest, through adverse possession. The legal title would then be joined with the equitable title, already in the railroad's hands, giving it complete title.

Dunbar premised its case on the idea of an equitable title which gave the railroad, and ultimately Dunbar, the right to compel a conveyance from the heirs, or successors, of the original contracting parties, Duncan Murchison and Duncan McCormick. However, this is not the same as the result reached in the M & R. Under the analysis here, there is no need to compel any conveyance from any person today. The perfection of title, through full performance coupled with possession, served to vest the actual, legal title in the railroad. Under this analysis, many of

the ideas of the state and federal government concerning the current enforceability of the documents are actually irrelevant. The contracts are not to be enforced today. The actual transfer of title, which resulted from the party holding the record title being disseized of his interest, occurred sometime in the nineteenth century.

The United States challenges the M & R on a host of grounds. Its objections are laid out first generally and then specifically, under nineteen separate headings. These objections concern the nature of the 1853 documents; their admissibility and authenticity; their construction by the magistrate judges; the construction of the documents in light of what is represented to be the public policy of North Carolina; the applicability of the statute of frauds and the rule against perpetuities; the effect of the railroad's delay in recording the documents; the potential bar to enforcement via statutes of limitations, or laches; and, questioning the magistrate judge's determination of adverse possession.

Dunbar has filed only a brief objection concerning the preclusive effect of the state court condemnation action. It is Dunbar's position that the state courts have conclusively determined that it is entitled to the condemnation proceeds, and that this issue should not be re-litigated. It should be noted that each party has its own ideas concerning the preclusive effect of the state court action and this will be discussed further.

The State of North Carolina, and the DOT have each filed objections. The State primarily focuses on a "public policy" argument, which has also been pressed by the federal government in its objections. The government entities contend that the public policy of North Carolina has been to limit title claims arising from abandoned railroad right-of-ways, and discouraging the acquisition by third parties of instruments purporting to convey such property interests. The DOT contends that Dunbar could not have acquired "perfect title" from Seaboard because the filing of the condemnation action occurred prior to the date of Dunbar's deed from Seaboard. The filing of such an action resulted in title being vested in the DOT, and Seaboard had nothing to convey. The DOT

argues that title should be quieted in its favor, and that Seaboard be declared as the party entitled to compensation.

This case can easily be seen as a nightmare of real property law, covering numerous legal issues. It has been further complicated by the passage of over a century, and the occurrence of several significant changes in the law. Additionally, the sheer volume of material to be considered has not made the task any easier. As evidenced by the size and scope of their M & R, the magistrate judges attempted to deal with all of these difficulties and produce a thorough and carefully reasoned opinion. Their efforts in dealing with these issues, as well as their management of the case, and repeated participation in settlement discussions with the parties, is greatly appreciated.

While I have reviewed all of the objections, I find several to be repetitious, and others to be either irrelevant, or of insufficient weight to warrant any lengthy discussion. In order to deal most effectively with the objections, I have divided the discussion into areas roughly parallelling those raised by the United States. Where objections have been found to be repetitious, I have placed them in the most appropriate area for discussion. However, I have not followed the precise order of either the M & R or the government's objections. I have deliberately reserved the later sections for those issues that I find to be the critical ones for analysis, including the construction of the 1853 documents. Until that point is reached, it will be assumed that the magistrate judges were correct in their finding that the 1853 documents were contracts to convey a fee simple interest.

1. *Assumptions by the Magistrate Judges*

The United States contends that the magistrate judges made several unwarranted assumptions in attempting to relate the 1853 documents to the subject property and its former railroad use. It argues that the M & R assumes that the contracts were, in fact, executed and signed by Duncan Murchison and Duncan McCormick; that the railroad over the subject property was the railroad contemplated by the contract; that no further documents were executed between Murchison, McCormick, and the railroad; that the railroad entered into the lands pursuant to the document; that the railroad made exclusive use of the property; and, that the railroad was laid across the entire property by 1872.

Prior to receiving the M & R, the government repeatedly contended that there were no genuine issues of material issues of fact in this case and that the matter was ripe for summary judgment. Nevertheless, when faced with an opinion adverse to its position, the government now attempts to raise a host of disputed issues of fact, contending that the magistrate judges have made unwarranted assumptions in their analysis. However, none of these objections are persuasive.

The government has failed to make any showing that the 1853 documents are not what they purport to be. Certainly the documents are admissible evidence. Fed.R.Evid. 901(a), 901(b)(8). There is no dispute that the documents had been in the possession of the railroad prior to their filing. No evidence has been presented that any other documents were executed by Murchison and McCormick, or that the railroad tracks were not laid pursuant to these contracts. While the railroad's use of the property may have been equally consistent with either a fee interest or an easement, there is no evidence that its use was not exclusive. The magistrate judges are not to be faulted for failing to engage in unsupported speculation from which to draw inferences.

The government contends that the M & R erroneously assumes that the railroad was laid across the entire property by 1872, relying on two outconveyances in 1872 and 1887. While it is true that these two deed references are the only evidentiary support that the railroad was in place by 1872, this is sufficient to support a factual finding, particularly in the absence of any contrary evidence. It is also argued that these and other out-conveyances conveyed the legal fee simple to some or all of the property underlying the right of way and did not make an exception for the railroad. However, the fact that a deed does not make exception for other conveyances is only one factor as to whether a fee was intended. There is no requirement

that a fee conveyance by one deed depends upon an exception being stated in a different out-conveyance. Furthermore, under the M & R's analysis, and the applicable law, subsequent purchasers would have taken property subject to all existing equities of which they had notice. The railroad's existence would constitute sufficient notice to impose a duty of inquiry on such purchasers.

The government also contends that the magistrate judges assumed that these were not "personal" contracts. It is asserted that the failure of the signatories to mention their "heirs" or "assigns" demonstrates that these contracts were binding only on Murchison and McCormick. However, this proposition does not square with the nineteenth century, pre-Connor Act, principle that, in an executory contract for the sale of land, the payment of the purchase money gives the vendee equitable title with the right to obtain a conveyance from every person having the legal title with notice of the vendee's claim. *Wilcoxon v. Calloway,* 67 N.C. 463 (1872). Similarly, the land's possession by one other than the vendor would be sufficient to constitute notice to a subsequent purchaser. *Webber v. Taylor,* 55 N.C. 9 (1854); *Johnson v. Hauser,* 88 N.C. 388 (1883); *Mfg. Co. v. Hendricks,* 106 N.C. 485, 11 S.E. 568 (1890).

The United States' objections are overruled.

2. *Effect of State Condemnation Action.*

A. *Collateral Estoppel Against Dunbar.*

The parties have varying ideas concerning the preclusive effect of the state condemnation proceedings. The United States argues that Dunbar is precluded from arguing any title other than that received from the Murchison heirs. While Dunbar obviously rejects this version of issue preclusion, it contends that the state courts have declared that it is the party entitled to the proceeds and that the DOT is collaterally estopped from contesting that determination.

The M & R correctly recognizes that federal courts generally accord preclusive effect to issues decided by state courts under the related doctrines of res judicata and collateral estoppel. *Allen v. McCurry,* 449 U.S.

90, 94–95, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980). Furthermore, 28 U.S.C. § 1738 requires that state determinations receive full faith and credit in federal courts. The M & R noted the state court's recognition that it was not adjudicating title claims of the United States. Indeed, it would have been without jurisdiction to do so. The magistrate judges determined that since the question of title could not be fully adjudicated in the state court action, this court was not bound by any determinations made there. They also rejected Dunbar's argument that the issue of title was irrelevant, finding that a determination that Dunbar never owned the property would indeed be relevant to its entitlement to condemnation proceeds.

In *Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979), the Supreme Court observed:

A fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and res judicata is that a "right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies...." Under res judicata a final judgment on the merits bars further claims by parties or their privies based on the same cause of action. Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation. Application of both doctrines is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions. To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.

440 U.S. at 153–154, 99 S.Ct. at 973–974 (citations omitted). The preclusive effect of a previous state court action is further pro-

tected by the Full Faith and Credit Act, which requires a federal court to "give the same preclusive effect to a state-court judgment as another court of that State would give." *Parsons Steel v. First Alabama Bank,* 474 U.S. 518, 523, 106 S.Ct. 768, 771, 88 L.Ed.2d 877 (1986).

However, one of the fundamental requirements for granting preclusive effect to a prior judgment is the previous court's jurisdiction. Both collateral estoppel and res judicata are concerned with questions and facts "directly determined by a *court of competent jurisdiction.*" *Montana v. United States,* 440 U.S. at 153, 99 S.Ct. at 973 (*quoting Southern Pacific R. Co. v. United States,* 168 U.S. 1, 48–49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897) (emphasis added)). Even as to prior determinations from state courts, the Supreme Court has long recognized that no preclusive effect will attach where the court was without subject matter jurisdiction over the controversy. *Lessee of Hickey v. Stewart,* 44 U.S. (3 How.) 750, 11 L.Ed. 814 (1845).

█ This fundamental requirement of subject matter jurisdiction begs the question as to whether the state court had jurisdiction to proceed with the state condemnation action, once the United States had asserted its claim. None of the parties disputes the proposition that the State cannot condemn federal lands. In the state action, the United States claimed that it was the owner in fee simple of the condemnation property, although its answer stated that the State could condemn an easement across the property. Judge Boyle's order in the removed state action stated that, absent a waiver of sovereign immunity and consent to be sued, the United States could not be sued. No such waiver was present in the context of a state condemnation action and the state court therefore had no jurisdiction over the United States. The action was therefore dismissed as to the United States, but was remanded to the state court as to the parties and issues remaining.

However, the United States' claim of the property raises the issue of whether the federal government was a necessary or indispensable party to the condemnation action, such that the state court could not proceed.

To the extent that a condemnation action is considered an action *in rem,* the fact that the United States claims ownership of the *res* would appear to deprive the state court of jurisdiction. A number of courts have concluded that, where the United States has an interest in land sought to be condemned in a state action, it is an indispensable party. *City of Mesa v. Salt River Project Agricultural Improvement and Power District,* 101 Ariz. 74, 416 P.2d 187 (1966), *cert. denied* 385 U.S. 1010, 87 S.Ct. 718, 17 L.Ed.2d 547 (1967); *Public Utility District No. 1 of Pend Oreille County v. Inland Power & Light Company,* 64 Wash.2d 122, 390 P.2d 690 (1964); *City of Fairbanks v. Electric Distribution System,* 413 P.2d 165 (Alaska 1966); *Gibbs v. Oklahoma Turnpike Authority,* 285 P.2d 190 (Okla.1955); *see also Pocono Pines Corporation v. Pennsylvania Game Commission,* 464 Pa. 17, 345 A.2d 709 (1975) (United States was an indispensable party in action to quiet title).

This jurisdictional question was not addressed further after remand. Judge Brewer may have believed that he could adjudicate the rights among the remaining parties, since questions of title in both the United States, and the State, were expressly left open. Under N.C.GEN.STAT. § 1A–1 Rule 19(b), courts are permitted to determine claims where there has not been a joinder of necessary parties, if it can do so without prejudice to the interest of those parties. The issues of title could be determined later and, conceivably, could collaterally trump any determination based on the limited decision in the condemnation action. Furthermore, since the United States had previously conceded that an easement could be established, and certainly did not oppose the existence of the road project, it would not be evident that its rights would be prejudiced.

█ Of course this is mere speculation as to why the action proceeded following remand and this court will not comment on whether such a course of action was advisable, given the serious title questions abounding in this case. For the purposes of this quiet title action, however, the United State's claim constituted a sufficient jurisdictional

defect to deprive the state court judgment of any preclusive effect here.

Even if the state court action was not completely without jurisdiction, its decision would still not prevent Dunbar's current title claims. The state court addressed the claims of title of Seaboard, Dunbar, and the Murchison heirs. Of those three parties, it determined that the Murchison heirs had "superior title," and that Dunbar's acquisition of that interest entitled it to compensation. There was no elaboration as to what was meant by "superior title." Certainly as this litigation has demonstrated, there could be any number of theories as to what lead to this conclusion.

Under North Carolina law, the application of collateral estoppel must meet a four-part test.

(1) The issues to be concluded must be the same as those involved in the prior action; (2) in the prior action, the issues must have been raised and actually litigated; (3) the issues must have been material and relevant to the disposition of the prior action; and (4) the determination made of those issues in the prior action must have been necessary and essential to the resulting judgment.

*King v. Grindstaff,* 284 N.C. 348, 200 S.E.2d 799, 806 (1973). The fourth requirement, that a determination have been necessary and essential, focuses the court's attention on precisely what was determined before. This is closely related to the principle that an estoppel by a prior judgment will not apply to matters that were not expressly adjudicated, and which are merely inferred from the prior judgment, unless such an inference is inevitable. 50 *C.J.S.* "Judgments" § 717 (1947).

In this case several inferences are possible. It may be that Judge Brewer determined that the railroad simply had an easement, which lapsed back to the Murchison heirs upon abandonment. However, he may also have adopted Dunbar's theory that the Murchison heirs still held a legal title which they had conveyed to Dunbar pursuant to the 1853 contract. Significantly, the issue of the enforceability of the 1853 documents does not appear to have been addressed. Since either

view could be inferred from Judge Brewer's ruling that the Murchison title was "superior," this does not bar Dunbar's claim through the railroad and the 1853 contracts.

## B. *Dunbar's Entitlement to the Condemnation Proceeds.*

The DOT objects to the M & R's finding that the railroad conveyed perfect title to Dunbar by the 1984 quitclaim deed, and that "the right to just compensation for land acquired by the State of North Carolina vested in Dunbar at the time the Complaint and Declaration of Taking were filed in the state condemnation action, August 17, 1984." Memorandum and Recommendation at 122. The State claims that although Dunbar had an unexercised contract to purchase as of August 17, 1984, title remained with Seaboard. Title vests in the DOT on the date the Complaint and Declaration of Taking are filed. N.C.Gen.Stat. § 136–104. In *North Carolina State Highway Commission v. York Industrial Center, Inc.,* 263 N.C. 230, 232, 139 S.E.2d 253, 255 (1964) it was held that "the right to compensation rests in the person who owned the land immediately prior to the filing of the complaint and declaration of taking," leaving "nothing" to "sell pending ascertainment of fair compensation." The State contends that title vested in the State on August 17, 1984 and that Seaboard had no interest to pass to Dunbar on September 10, 1984.

■ This objection is well taken and to the extent that the M & R found that the railroad conveyed "title" to Dunbar this was error. Under the M & R's analysis, coupled with the condemnation statute, title would have vested in the State. However, this correction does not alter Dunbar's entitlement to condemnation proceeds, as Seaboard conveyed to Dunbar whatever interest it had in the property.

The holder of title to real property at the time a complaint and declaration of taking are filed in a state condemnation action can later transfer any interest in the property, including a right to the condemnation proceeds, with a quit claim deed. "A quit claim deed is one that ... conveys only the grant-

or's present interest in the land described, if the grantor has any interest." Patrick K. Hetrick and James B. McLaughlin, Jr., *Webster's Real Estate Law in North Carolina* § 155 (3rd Ed.1988). This instrument is one of conveyance and "passes whatever right, title, and interest grantors had power to convey at the time of its execution and delivery." *Hayes v. Ricard*, 245 N.C. 687, 688, 97 S.E.2d 105 (1957). The court, in *Coble v. Barringer*, 171 N.C. 445, 448, 88 S.E. 518 (1916), stated clearly that a quit claim deed conveys no land or indefeasible title but only what the grantor has "to convey and nothing more."

If Seaboard had no title to the property at the time of the quit claim deed to Dunbar, Dunbar could have received only Seaboard's compensation interest in the property and nothing more. A title holder is entitled to just compensation. After title vested to the state, the prior owner's only interest in the property was its right to proceeds from the condemnation. If Seaboard was the owner of the property at the time title vested to the state, it owned the right to proceeds resulting from the condemnation.

Generally, one party can transfer a right to proceeds to another for valuable consideration. *Ledbetter Bros., Inc. v. North Carolina Dept. of Transp.*, 68 N.C.App. 97, 314 S.E.2d 761 (1984). Where the debtor has notice of an assignment, it is charged with the duty of making payments to the assignee. *Lipe v. Guilford Nat. Bank*, 236 N.C. 328, 72 S.E.2d 759 (1952). Through the quit claim deed, Seaboard assigned its interest in the property, the proceeds, to Dunbar for valuable consideration.

Not all interests, however, are assignable. The State argues that the court's ruling in *Industrial Center* prohibits the assignment of proceeds from property condemned by the State through the Department of Transportation. The court in *Industrial Center* states clearly that the title holder at the time of filing the complaint and declaration of taking "has nothing" to sell. 263 N.C. at 232, 139 S.E.2d 253. This statement is followed by language revealing prior law where "title was not divested until compensation was paid ..." and the owner "could sell ..." after the

complaint was filed. *Id.* The court goes on to say that, previously, the owner at the time "the award was confirmed was the person to be compensated." *Id.*

The North Carolina Department of Transportation commenced the condemnation action on August 17, 1984 in the Cumberland County Superior Court. Dunbar answered claiming title based on a contract to purchase recorded on 23 May 1984 in Book 3002 at Page 241 of the Cumberland County Registry. Seaboard executed a quit claim deed in favor of Dunbar on 10 September 1984, and this deed was recorded on 27 December 1984 in Book 3042 at Page 111 of the Cumberland County Registry.

A deed must be delivered in order for a conveyance to be valid. WEBSTER, § 156; *Ballard v. Ballard*, 230 N.C. 629, 55 S.E.2d 316 (1949). No deed had been delivered to Dunbar at the time of the complaint, so Seaboard still held title to the property at the time the complaint was filed. Applying the court's analysis in *Industrial Center*, Seaboard, as the owner at the time of the complaint, is entitled to the condemnation proceeds. If title vested at the time the state filed its complaint, Seaboard could not transfer title to Dunbar. In *Industrial Center*, the court expressly stated that the title holder has nothing to transfer pending ascertainment of fair compensation. 263 N.C. at 230, 139 S.E.2d 253. The *Industrial Center* court, however, did not consider, expressly, whether the title holder could assign its right to compensation.

The assignment of proceeds issue was presented to the North Carolina Superior Court in the condemnation proceedings concerning the quit claim deed dated 23 April 1986, and transferred to Dunbar by the heirs of Duncan Murchison. Superior Court Judge Coy Brewer found that the Murchison heirs conveyed, through the quitclaim deed of 23 April 1986, their interest in the property and assigned their right to any condemnation award to Dunbar. Judge Brewer then decreed that Dunbar, through its acquisition of the Murchison heir's interest, was the party with superior title to the property. The North Carolina Court of Appeals affirmed this determination. The North Carolina Su-

preme Court granted a discretionary review but dismissed the action after the briefs were submitted, stating that discretionary review had been improvidently granted.

The same type of transaction occurred between Dunbar and Seaboard, as between Dunbar and the Murchison heirs. Like the transfer from the Murchison heirs, Seaboard conveyed its interest to Dunbar after the State filed its complaint in condemnation. The State expressly argued on appeal that neither Dunbar, nor the Murchison heirs, held a compensable interest in the property as of the date of taking. The result obtained indicates that the North Carolina courts do not interpret *Industrial Center* as precluding a party from conveying its interest in condemnation proceeds through a quit claim deed, and transferred after the complaint and declaration of taking are filed.

But for the jurisdictional problems previously discussed, this would constitute *res judicata* between Dunbar and the State over the entitlement to the proceeds. However, even absent a blanket preclusive effect, the appellate treatment of this issue is strong persuasive authority. Certainly this federal court is loath to reach an interpretation of state law, when a state appellate court has been previously presented with the identical issue. Accordingly, the court concludes that Seaboard's post-condemnation transfer to Dunbar effectively transferred and assigned to Dunbar whatever interest Seaboard had remaining in the property, including any entitlement to condemnation proceeds.

The objections of the United States, Dunbar, and the Department of Transportation are overruled.

### 3. *Statute of Frauds*

■ The United States challenged the 1853 documents as violative of the statute of frauds, by an inadequate description. The government contends that these documents do not describe any particular parcel of land, or even any particular location (township, county, or state). The magistrate judges, however, determined that the fact that the railroad was given the right to select the particular tract was sufficient to satisfy the statute.

In order to satisfy the statute of frauds, the memorandum or writing must contain a description of the land, "either certain in itself or capable of being reduced to certainty by reference to something extrinsic to which the contract refers." *Lane v. Coe*, 262 N.C. 8, 12, 136 S.E.2d 269 (1964). However, the M & R noted that there has been a split of authority concerning the sufficiency of description, when the contract gives one party the right to select the particular tract to be conveyed, and that other jurisdictions have allowed such a subsequent location of track by a railroad. M & R at 46. Similarly, in *Kidd v. Early*, 289 N.C. 343, 222 S.E.2d 392 (1976) the North Carolina Supreme Court adopted the principle that a description was not deficient where the contract gave the vendee the right of selection, and the conveyance was conditioned on a new survey which would provide a method for obtaining an exact description.

Other North Carolina cases are in line with the principle that a contract can be made sufficiently definite by the railroad's subsequent selection of the property. *Hemphill v. Annis*, 119 N.C. 514, 26 S.E. 152 (1896); *May v. Atlantic C.L.R. Co.*, 151 N.C. 388, 66 S.E. 310 (1909). The court in *May* recognized the potential for a railroad to possess a "floating right of way," which could be made definite by locating the track. It is true that in *Mfg. Co. v. Hendricks*, the court found a description in a bond for title to be ambiguous which simply referred to thirty acres as a portion of the "Deaver tract," which was described as joining certain other property. Nor was the description aided by evidence of a subsequent survey. However, the facts of *Hendricks* did not show that a survey was a term of the contract from the time of its inception. *Cf. Beattie v. R.R.*, 108 N.C. 425, 430, 12 S.E. 913 (1891) (court assumes, for sake of argument, that description was sufficiently definite because location could be made certain by a survey contemplated by the parties in entering into the contract).

The United States argues that cases relied on in the M & R are distinguishable. For example, in *McCotter v. Barnes*, 247 N.C.

480, 101 S.E.2d 330 (1958) a deed to a railroad provided that a 100 foot wide strip be cut out of the lands of the grantors, located by the grantees and, when so located, become part of the deed description. 247 N.C. at 482. The M & R found it persuasive that, while the issue of the statute of frauds was not specifically addressed in *McCotter*, that such a method of providing a description was sufficient to convey a fee interest. The government contends that since *McCotter* concerned a deed, different rules of interpretation apply and reliance on this case was inappropriate. The government also argues that while cases involving a "floating right-of-way," with the description to be later determined, are sufficient for an easement, it should not be so for fee interest.

I am not persuaded by this line of argument. It has not been shown that the statute of frauds distinguishes between the interest to be conveyed. Its concern is with the existence of a written agreement by the party to be charged and, for purposes here, the adequacy of description of the subject matter of the contract. While the government's policy arguments may indeed have a place, it is more properly the question of ascertaining the parties' contractual intent, rather than the adequacy of the contract's description. However, there are other reasons why the statute of frauds does not bar Dunbar's claim.

▮ While the statute of frauds can prevent the enforcement of executory contracts, it does not affect contracts which have been fully executed. *Herring v. Volume Merchandise, Inc.,* 249 N.C. 221, 106 S.E.2d 197 (1958). When the railroad located the tracks on the property by 1872, the contracts became fully executed and the statute of frauds would not affect them. Furthermore, the defense of the statute of frauds is personal to the parties to the contract and is not available to strangers to the agreement, although any person against whom enforcement is sought may raise the defense. *Davis v. Lovick,* 226 N.C. 252, 254, 37 S.E.2d 680 (1946), *overruled on other grounds by Kent v. Humphries,* 303 N.C. 675, 281 S.E.2d 43 (1981). While Dunbar's original position sought an enforcement of the contract, the

magistrate judges' determination concerning adverse possession and "perfection of title" render this unnecessary.

Along these lines, the government objects to the M & R's statement that it is "unquestioned" that there has never been a dispute concerning the location of the track, and argues that is only "unquestioned" because of the passage of 135 years. The government's objection answers itself. For these reasons, the 1853 documents do not violate the statute of frauds and the government's objections are overruled.

### 4. Rule Against Perpetuities

The government also argues that the 1853 documents are not enforceable because they violate the Rule Against Perpetuities. The rule typically applies to the vesting of future interests in property and requires that such vesting must occur not later than twenty-one years after some life in being at the creation of the interest. *Joyner v. Duncan,* 299 N.C. 565, 568, 264 S.E.2d 76 (1980). Traditionally, the rule applies to the law of trusts, or devises according to a will, and not to the enforcement of contracts. However, as the M & R recognized, the courts of North Carolina have applied the rule's provisions to property interests enforceable in equity, and particularly to contracts involving "rights of first refusal." *Coxe v. Wyatt,* 83 N.C.App. 131, 134, 349 S.E.2d 75 (1986), *review denied* 319 N.C. 103, 353 S.E.2d 107 (1987).

▮ The M & R relied on *Rodin v. Merritt,* 48 N.C.App. 64, 268 S.E.2d 539, *review denied* 301 N.C. 402, 274 S.E.2d 226 (1980), and *review denied* 274 S.E.2d 231 (1981), and similar cases, applying the doctrine of contractual performance within a reasonable time. In *Rodin* the court determined that where an executory contract for sale did not provide a time limit for transfer, the law implies that it is to be done within a reasonable time. Furthermore, this reasonable time would not extend beyond a period of 21 years. The magistrate judges found that, based on the out-conveyances of record, the railroad had been laid within this twenty-one year period.

The government's current objections state that the M & R erred in applying *Rodin*. It is contended that *Rodin* is a 1980 case indicating that the rule has little relevance to modern sophisticated commercial transactions. The government argues that there were better reasons for the rule's use at earlier periods, and that the 1853 documents do not involve sophisticated commercial transactions. Such an argument, of course, presents a fundamental difficulty present throughout this entire case. The passage of time involved has been witness to numerous significant changes in the law and there is always a question as to which law applies.

Nevertheless, on balance, I am convinced that the approach in *Rodin* is properly applied here. First, contrary to the government's bald assertion, these documents do fall within the broad spectrum of a commercial transaction. Additionally, in situations concerning long delay in the attempt to enforce contract rights to property, nineteenth century cases typically disposed of the issue on the grounds of laches, limitations, or abandonment, rather than the rule. *See Beattie v. R.R.*, 108 N.C. at 434, 12 S.E. 913 (where railroad acquired contract for right of way, failure to work on the road for a period of twenty-five years evidence of abandonment of right-of-way). The documents therefore will be construed as containing an implied term of performance within a reasonable period, that being twenty-one years from the date of execution.

Nor am I persuaded by the government's contention that these documents constitute rights of first refusal. The M & R noted that such rights are dependent on the actions of third parties in making an offer to purchase. While the government argues that this is not necessarily so, it fails to supply any authority in support of this proposition.

The government's remaining arguments are not persuasive and its objections are overruled.

### 5. United States Claim of Title

The M & R observed that the United States claimed title to the land under the abandoned right-of-way under several theories. One claim was through the North Car-olina Abandoned Railroad Easement Act, N.C.GEN.STAT. § 1–44.2, which presumes a vesting of the interest in such abandoned easements to adjacent landowners. A similar argument was based on the common law principle that railroad easements, when abandoned, revert to abutting landowners. The United States also claimed ownership of the property by rules of construction to be applied to various deeds, arguing that where the deed references a monument the conveyance is to the center of the monument, if it has width.

The magistrate judges determined that the United States interest depended upon whether the railroad held a fee or an easement. Both the common law presumption and the Abandoned Railroad Easement Act are dependent on the railroad's interest being that of an easement. Furthermore, although deeds to the United States may reference the railroad as a monument, if the grantor did not own the fee interest in the property such a description has no effect.

The United States premises its objection on the M & R's alleged failure to recognize that legal title ultimately passed out of the heirs of Duncan Murchison, to innocent third party purchasers and ultimately to the United States in 1918. Under the United States' view, the critical period would have been when the legal title passed from Murchison, and the railroad failed to act to preserve whatever equitable interest it had.

Insofar as the United States seeks to rely on the presumption of reversion through either the common law, or the Abandoned Railroad Easement Act, the magistrate judges were correct in their assessment. Furthermore, the United States has not adequately addressed the authority, previously discussed, that one in possession under an equitable title can recover against *anyone* who holds the legal title with notice, and that the railroad's possession would constitute notice. Much of the United States' position rests on the notion of conveyance of the legal title to "innocent" third party purchasers. However, as correctly discussed in the M & R, the law prior to the Connor Act was that possession constituted notice to the world

and there. could be no purchasers without notice. This analysis is more properly reserved for a discussion on the railroad's failure to record the 1853 documents.

Nor does the United States respond to the position expressed in the M & R that even if the record owners of the property held the naked legal title, they would have been dis-seized of this interest prior to the conveyances to the United States through the adverse possession of the railroad. Contrary to the government's rather strident objections, the M & R does adequately address the issues of both legal and equitable title.

Except as noted, the government's objections are overruled.

### 6. *Equitable Title*

The M & R's result is premised largely on the concept that a contract to convey a fee interest would have given the railroad an equitable title, and the right to compel conveyance of a deed upon full performance. The government contends that legal title, rather than equitable title, is the significant issue. It argues that the M & R assumes that the legal title remained with the signers of the 1853 documents, and was passed to their heirs. It is asserted that this is error and that the legal title was actually conveyed to innocent third party purchasers.

The government is incorrect in its statement that the M & R assumes that the legal title remained with Murchison and McCormick, or their heirs. The relevant case law establishes that vendors and vendees, under a contract for the sale of land, occupied roles similar to mortgagors and mortgagees, with the vendor holding the legal title in trust, and as security for the payment of the purchase price. Furthermore, the government fails to address the existence of authority that payment of the purchase money gives the vendee equitable title with the right to obtain a conveyance from *every* person having the legal title with notice of the vendee's claim. *Wilcoxon v. Calloway*, 67 N.C. 463 (1872).

The government's argument on this point rests largely with its contention that any subsequent conveyance would have been to innocent third party purchasers, including the United States. Under the government's theory, this would have triggered an obligation on the part of the railroad to bring an action to preserve its interest in the fee. No authority is cited here for these propositions, and they are better dealt with in discussions of the railroad's delay in registration, and the applicability of any statute of limitations.

The M & R relied on the case of *Corning v. Lehigh V.R. Co.*, 217 N.Y.S.2d 874, 14 A.D.2d 156 (1961), in which a railroad entered property under a contract to convey, built its tracks, but never obtained a deed for the property. The contract was executed in 1867 but not recorded until 1879. The *Corning* court determined that the contract gave the railroad an equitable fee and sustained its title against a challenge brought by subsequent purchasers of the property in the 1950s. The government attempts to distinguish *Corning* from the facts *sub judice* by referring to the 1853 documents bare-boned nature. However, this objection actually goes to the sufficiency of a description, which has already been addressed, or to the construction to be afforded the instrument, which will be addressed later. The government also complains that the contracts referred to in the North Carolina vendor/vendee cases typically involved individuals, not corporations, and installment payments for property. Although it argues that this contract to a railroad should not be viewed in the same light, it fails to provide any authority for such a distinction. *Corning*, and the other authorities relied on by the magistrate judges, sufficiently demonstrate that railroads can recover on an equitable title from a contract to convey, and the government's objections are overruled.

### 7. *Delay in Recording the 1853 Documents*

There is no dispute that the 1853 documents were not recorded until 1981. The United States has argued that where the property has passed to subsequent purchasers for value, these documents are outside the chain of title and should not be enforced. The magistrate judges determined that the Connor Act contained an exception for those in actual possession of land under unrecorded

instruments, and that the pre-Connor Act registration statutes did not bar Dunbar's current claim under the documents.

The Connor Act of 1885, currently codified at N.C.GEN.STAT. § 47–18, transformed North Carolina into a "pure race" state for the recording of deeds, contracts to convey, and other instruments affecting interests in land. Under its terms, no such instrument is effective as against either lien creditors, or purchasers for value, until the time of its registration. The Act, however, does contain the following exceptions:

> This section shall not apply to contracts, leases or deeds executed prior to March 1, 1885, until January 1, 1886; *and no purchase from any such donor, bargainor or lessor shall avail or pass title as against any unregistered deed executed prior to December 1, 1885, when the person holding or claiming under such unregistered deed shall be in actual possession and enjoyment of such land, either in person or by his tenant, at the time of the execution of such second deed,* or when the person claiming under or taking such second deed had at the time of taking or purchasing under such deed actual or constructive notice of such unregistered deed or the claim of the person holding or claiming thereunder.

N.C.GEN.STAT. § 47–18(b) (emphasis added). The magistrate judges found that the actual possession exception applied to unregistered contracts to convey, *McNeill v. Allen,* 146 N.C. 283, 59 S.E. 689 (1907), and that the railroad's actual possession of the property caused it to fall within this exception.

The government argues that the Connor Act exception is only properly read to extend until January 1, 1886, although conceding at oral argument that the magistrate judges' interpretation was a possible reading. I am persuaded that the magistrate judges correctly recognized that actual possession constitutes a distinct exception to the Connor Act. Certainly it has been recognized as such by the North Carolina courts. *Laton v. Crowell,* 136 N.C. 377, 48 S.E. 767 (1904); *Collins v. Davis,* 132 N.C. 106, 109, 43 S.E. 579 (1903); *see also Cowen v. Withrow,* 112 N.C. 736, 740, 17 S.E. 575 (1893) (Clark, J.,

dissenting). The government's objections on this point are overruled.

The magistrate judges also discussed the applicability of pre-Connor Act statutes. The M & R specifically refers to several incarnations of the state's registration requirements. In the Revised Statute of 1836–37, it was provided that "no conveyance or bill of sale, for land," would be "good and available in law," unless acknowledged by the vendor or grantor, or proved under oath, and registered within two years. Rev.Stat. Ch. 37 § 1 (1837); Bat.Rev. Ch. 37 § 1 (1837). It was observed that the 1855 Code also required that contracts to convey be registered within two years from their date. Rev.Code Ch. 37 § 26 (1855). The 1883 Code provided:

> No conveyance of land or contract to convey . . . shall be good and available in law unless the same shall be acknowledged by the grantor or proved on oath by one or more witnesses in the manner hereinafter directed, and registered in the county where the land shall lie within two years after the date of the said deed. . . .

North Carolina Code (1883), § 1245. It further required:

> All contracts to sell or convey any land, tenements, or hereditaments, or any interest in or concerning them, and all leases required to be put in writing upon due proof or acknowledgement thereof in the manner in this chapter provided for the conveyance of lands, shall be registered in the proper county within two years from the date of such contracts or leases.

§ 1264.

The magistrate judges observed that despite the existence of these two-year recordation periods, the General Assembly was routinely in the habit of extending the time for registration, thereby making the statutory periods misleading. *Laton v. Crowell,* 136 N.C. at 379, 48 S.E. 767. The M & R noted the existence of other situations which would preserve a party's interest, despite a failure to comply with registration, such as lost, destroyed, or wrongfully withheld deeds. It also relied on the cases of *Edwards v. Thompson,* 71 N.C. 177 (1874) and *Robinson v. Willoughby,* 70 N.C. 358 (1874) for the

proposition that a contract to convey was not void as to subsequent purchasers for lack of registration, particularly where notice of the contract would have been available to third party purchasers, by virtue of the possession of the property by one other than the vendor.

The government argues that the railroad's failure to register the contracts within two years, as required by the then applicable statutes, renders the contracts unenforceable today. It contends that the applicable authority to the railroad's failure to record is found in the cases of *Phillips v. Hodges,* 109 N.C. 248, 13 S.E. 769 (1891) and *White v. Holly,* 91 N.C. 67 (1884). The government also asserts that it was error for the M & R to discuss cases dealing with deeds instead of contracts.

The discussion of cases involving deeds was not error. First, this court interprets the magistrate judges' discussion of cases involving lost deeds as simply being illustrative of the point that the failure to register an instrument did not automatically deprive a party of his claimed interest. Second, the recording statutes relied on by the government, whether the Connor Act or the previous Code § 1245, lump deeds and contracts together for the purpose of requiring registration, even though these documents have different legal consequences. As will be seen, an analysis of deed cases can aid the court in determining the effect of non-registration in light of the changing statutory landscape.

*Edwards v. Thompson* involved an action to recover real property and was originally brought against James H. Thompson and his tenant Redford, who was in possession. The land was sold at execution to one Whitfield, who received a sheriff's deed for it on April 4, 1861. On the same day, Thompson and Whitfield entered into a written contract whereby Thompson would pay Whitfield the price from the execution sale, and would satisfy a note given by Thompson to a third party, for which Whitfield was the surety. If these conditions were met, Whitfield was to convey the land back to Thompson. Thompson stated that the note was paid and that Whitfield was indemnified for his purchase price. Thompson also alleged that Whitfield,

for the purpose of defrauding him, sold the land to the plaintiff who had knowledge of Thompson's rights. The contract between Thompson and Whitfield was never registered. 71 N.C. at 178.

Thompson remained in possession of the land, either personally or through his tenants. A tenant named Simon was in possession on March 26, 1867, when Whitfield sold the property to the plaintiff, who was a resident of South Carolina. The trial court found that the plaintiff had no knowledge of the agreement between Whitfield and Thompson, except what could be inferred from Simon's possession, which was also unknown to the plaintiff. The principle question before the court became whether the plaintiff was a purchaser without notice. The trial court instructed the jury that Thompson's possession after the sheriff's sale would only be sufficient to give plaintiff notice that he claimed as a tenant at sufferance, and would not be notice of any greater claim. The North Carolina Supreme Court rejected this, stating:

> There is some difference among the authorities on the question as to whether actual possession by a person is notice to a purchaser, of an equity in favor of such person against a vendor. But the decided weight of authority is in favor of the proposition that possession, if open, notorious and exclusive, puts a purchaser upon enquiry, and is notice of every fact which he could have learned by enquiry.

>     ·    ·    ·    ·    ·

> [The] cases clearly go beyond the line laid down by the Judge. They held that if the tenant in possession has a contract to purchase, notice of the possession is notice of that contract, because it might have been found out on enquiry.

71 N.C. at 179–80.

The plaintiff attempted to distinguish the authorities relied on by the court contending that such constructive notice principles only applied to situations where the purchaser lived in the area and could be presumed to know of the possession. The court responded:

We do not think this is the true principle. On policy the law avoids such minute and uncertain enquiries. It says that if a contract of sale be registered it is conclusive of notice, notwithstanding the purchaser lived in another State and did not, in fact, search the Register's books. 1 Story Eq. Jur. Sec. 403. And on the same principle it follows that open, notorious and exclusive possession, in a person other than his vendor, is a fact of which a purchaser must inform himself, and he is conclusively presumed to have done so. If the rule were otherwise, every one who contemplated a fraud on his tenant under a contract to purchase would evade it by going to another State to sell over him; and the purchaser would carefully sustain from all enquiry.

.     .     .     .     .

In this case, Simon held directly of Thompson, it does not clearly appear whether as a cropper or tenant. It must be presumed that Simon, on enquiry, would have referred the intending purchaser to Thompson, from whom he would have obtained full notice.

*Id.* at 180–81.

As a second challenge to Thompson's interest, the plaintiff put forth the lack of registration of the written contract between Thompson and Whitfield. The court stated:

Further, it is said for the plaintiff that Thompson is in laches because he failed to register his contract with Whitfield. This is true; but the act (Rev.Code, Ch. 37, Sec. 26) does not say that a contract to purchase shall be valid only from the registration, as it does in Section 22, of mortgages. We cannot import into the act a provision it does not contain, merely because a contract to purchase is in many respects regarded as a mortgage, when the act makes a difference. The cases of *Webber v. Taylor,* [55 N.C. 9] and of *Taylor v. Kelly,* [56 N.C. 240] cited above, are conclusive that the contract to purchase was not void as to subsequent purchasers for want of registration.

*Id.* at 181.

In *White v. Holly,* an action for the specific performance of a contract to convey, the plaintiff sought to prove the existence of the contract by putting two receipts into evidence. The receipts were of different dates for certain cotton, the price of which was, "by the terms of the receipts, 'to go, as part payment, on the price of land he (the plaintiff) lives on.'" The defendant objected to the receipts on the grounds of non-registration, but they were admitted into evidence. 91 N.C. at 67.

The North Carolina Supreme Court stated that the law was now clear that all contracts for the conveyance of land must be proved and registered before they could be used in evidence, and that "[t]hey are now put on the same footing with deeds for real estate, as evidence, and cannot be admitted as such until proved and registered." *Id.* at 68. The court noted that while Code § 1264 required registration within two years, that alone might not bar the receipts from being put into evidence under the authority of *Edwards v. Thompson.* However, § 1245 now provided that "no conveyance of land, nor contract to convey . . . shall be good and available in law," unless registered within two years from its date of execution. This operated as an expansion of previous Code sections on registration and provided that, until a contract was proved and registered, it could not be received into evidence, or otherwise serve the purpose for which it was created. *Id.*

The United States contends that this pre-Connor Act law should be applied and, since the 1853 contracts were not registered within two years, they cannot be admitted into evidence in this action. Placed in different terms, the United States' position is that the failure to register this contract under pre-Connor Act law, rendered the 1853 documents legal nullities following the Act. However, this position does not appear to have been adopted by the North Carolina courts.

In a case that was repeatedly before the North Carolina Supreme Court, *Cowen v. Withrow,* 116 N.C. 771, 21 S.E. 676 (1895), the court dealt with the Connor Act proviso concerning the protection of those claiming under pre-Act unregistered deeds. *Cowen* was an action in ejectment where the plaintiff claimed the disputed land under a sheriff's execution deed, dated December 3, 1888,

showing that the lands were sold as those of T.J. Withrow. Plaintiff admitted, however, that the defendants, T.J. Withrow and his wife P.J. Withrow, were in possession. *Id.* at 772, 21 S.E. 676.

P.J. Withrow sought to introduce a deed from T.J. Withrow to her and covering the disputed land. The deed was dated August 5, 1882, but was not registered until November 26, 1889. The admission of the deed was objected to and it was not admitted into evidence. P.J. Withrow then sought to introduce the testimony of T.J. Withrow to the effect that he had informed the plaintiff, prior to purchase, that he (T.J.) did not own the land and that he had previously deeded it to his wife. This evidence was also objected to and excluded. The state Supreme Court then addressed the question of whether it was error to exclude this evidence. The Court stated:

> The case on appeal does not state the grounds upon which the court held that the deed of T.J. Withrow to the defendant P.J. Withrow was incompetent. It was registered, and there is no objection made to the sufficiency of the probate or to the form of the certificate. It was for the very land in controversy, and why it was not competent evidence we are unable to see. As to what effect it should have upon the issues then before the court, and being tried, was a different thing, and one proper for the instructions or rulings of the court, according to its understanding of the law. We can conceive of no reason for excluding this deed, unless we hold that a deed executed in 1882 could not be probated and registered in 1889. Indeed this was the ground upon which plaintiff's counsel undertook to sustain the ruling of the court, in rejecting this evidence, in his argument before us,—that it was executed before December, 1885, and was not registered before December, 1885, and could not be registered after that time.

*Id.* at 773–74, 21 S.E. 676.

The court stated that it was not prepared to sanction such a proposition. Furthermore, under the Connor Act, where a purchaser has knowledge that another has purchased the land and has an unregistered deed dated prior to December 1, 1885, the second purchaser acquires no title as against the prior unregistered deed. As this was the law, evidence tending to show that the plaintiff purchased with knowledge of the prior unregistered deed was not only competent, but bore on the main issue of the case. *Id.* at 774–75, 21 S.E. 676. The court held that the Connor Act continued former § 1245 in force until repealed by the Act's effective date. This being so, "there has been no time since 5 August, 1882, when defendant might not have registered her deed." *Id.* at 778, 21 S.E. 676.

Of special significance for this case is the fact that Justice Clark's dissent adopts essentially the same argument as the United States does today. Under his view, § 1245 provided that a deed would not be "good and available" unless registered within two years. As it was not registered, it became a legal nullity as to executions or liens against the grantor unless the two year limitation was extended. No such statute of extension had been passed, unless the second proviso of the Act was construed as such an extension. However, Justice Clark saw no reason to consider such a construction since the judgment lien in question had attached prior to December 1, 1885, at a time when the unregistered deed was a nullity.

Nevertheless, it soon became clear that the Supreme Court did not agree with Justice Clark's viewpoint. In *Hallyburton v. Slagle*, 130 N.C. 482, 41 S.E. 877 (1902) the defendant Slagle had been the fee owner of a lot on April 18, 1868 when he deeded the property to N.W. Woodfin, in trust for Winnie Slagle (defendant's wife) for her life and at death to her heirs. One month after making the deed, defendant went into bankruptcy and a purchaser named Long obtained the property. Long assigned his bid to the defendant and he received a deed, although it was later lost or stolen.

The deed from defendant to Woodfin was not registered until 1896, and the defendant argued that it could not be registered or admitted into evidence. Defendant further argued that § 1245 of the Code was expressly repealed by the Connor Act and that there

was no extension of time for registration. The court held:

> So, this registration depends upon the construction given to chapter 147, Laws 1885, and we are clearly of the opinion that act authorized its probate and registration. That act expressly provides for registration. It expressly repeals section 1245 of The Code, and it contains no limitation as to the time when any instrument required or allowed to be registered shall be registered. The provisions of chapter 147, Laws 1885, are as follows: "No conveyance of land, or contract to convey, or lease of land for more than three years shall be valid to pass any property, as against creditors or purchasers for a valuable consideration from the donor, bargainor or lessor, but *from the registration thereof,* within the county where the land lieth." It is seen that there is no limitation as to the time when the deed or other instrument shall be registered. But it shall only be good against the purchasers for a valuable consideration, creditors, etc., *from the date of its registration;* and for us to put a limitation in the statute would be to write something in the statute that is not there, and in our opinion should not be there. The deed from the defendant to Woodfin, was properly admitted in evidence.

*Id.* at 484–85, 41 S.E. 877 (emphasis in original).

*Cowen* and *Hallyburton* demonstrate that, upon the effective date of the Connor Act, it controlled as to the effect of non-registration. The mere fact that an instrument had not been registered within the two year period required under the previous Code did not automatically render it a nullity. The Connor Act simply provided that the registration of a subsequent deed might defeat a prior unregistered deed, unless the actual possession exception applied.

In this regard, the government's reliance on *Phillips v. Hodges* is misplaced. In that case the land in question was owned by one W.B. Surles, who conveyed it to Nathan L. Phillips and his wife Patience W. Phillips on April 2, 1852. On April 28, 1852, Nathan Phillips alone executed a deed back to Surles who went into possession. Such a deed, how-

ever, did not serve to deprive his wife of her interest. W.B. Surles remained in possession until February 7, 1859 when he sold the land to James C. Surles, who went into possession and remained there until his death in 1880. The family of James C. Surles remained in possession following his death until the sale of the land, under special proceedings, to H.A. Hodges. The deed from the administrator to Hodges was executed on April 7, 1884 and registered April 23, 1884. At the time of the public sale the administrator publicly proclaimed the title to be good. This statement was made in the presence of W.B. Surles, Nathan L. Phillips and Patience W. Phillips. Over a year after Hodges had paid for the land, registered his deed, and gone into possession, Nathan Phillips showed Hodges the old deed from W.B. Surles to Nathan and Patience Phillips. Phillips offered to surrender the deed to Hodges for $25.00, which was refused. Nathan and Patience made a deed of gift to their son, who sought recovery of the land. The deed from Surles to the Phillips' was not registered until January 11, 1886. 109 N.C. at 248–49, 13 S.E. 769.

In denying recovery for the land, the court through Justice Davis, first observed that Nathan Phillips' silence at the public sale acted as a fraud on the purchaser for value and would estop him from asserting title to the land. Justice Davis went on to comment that, but for applicable precedent, he would find such an estoppel in Patience Phillips as well. The court observed that while the statute of presumptions would likely bar any such recovery, the defendant chose to rely solely on the registration requirements of the Connor Act.

The court addressed two points in rejecting the claim under the Surles–Phillips deed of 1852. The first is that the purchaser for value would have had no notice of the Phillips claim. The only source of information would have been from the Phillips' themselves, and they acknowledged the good state of the title by their silence at the public sale. The second point, and one relied on by the government, is the effect of the Phillips' failure to register the deed. It was argued that the

deed, when registered, related back to the date of execution. The court stated:

"[t]he error of counsel is in overlooking the fact that but for the act of 1885, and the various successive acts after two years from April, 1852, extending the time for registration, the deed to Phillips and wife would have conveyed no legal title unless registered within two years from 2 April, 1852."

Registration is required for the protection of innocent purchasers for value and creditors, and to prevent frauds, and the Legislature did not think it was wise to extend the time for registration after 1 January, 1886, so as to give legal validity to deeds, as against innocent purchasers and creditors....

*Id.* at 251–52, 13 S.E. 769.

Several factors demonstrate that *Phillips* is sufficiently distinguishable from the facts here. To begin with, the purchaser for value acquired his interest without notice during the period prior to the Connor Act. He had no notice, and no method of acquiring any notice of the claim of Patience Phillips. Although the 1852 deed was registered, it was not done until after the effective date of the Connor Act. Most important, there was no actual possession of the property by the Phillips, to bring their claim within the Connor Act proviso.

The government's position on registration might have merit if an action had been brought prior to 1885. However, there has been no showing of such an action and this quiet title case is controlled by the Connor Act, including its actual possession exception. Furthermore, under the government's own factual contentions, the first "purchaser for value" did not take the land until 1889, by I.A. Murchison's deed to G.W. Williams and K.M. Murchison. Memorandum of Law in Support of Defendant United States of America's Motion for Summary Judgment Against Dunbar Corporation, at 3–4. This purchase would clearly have been subject to the Connor Act, and its actual possession exception. The government's objections on this point are overruled.

## 8. *Waiver and Abandonment*

The United States contends that theories of waiver and abandonment apply to this case and that inaction by the railroad, an entity of legal sophistication, has legal significance. The government states that the railroad was the only party with knowledge of any rights possessed under the 1853 documents, and that a failure to act to preserve those rights, within a reasonable time, should be construed as a waiver. It is further argued that, in the eyes of the world, the railroad possessed only an easement. The railroad's intent to possess no more than an easement is evidenced by both its inaction to preserve a greater right, as well as its position in this litigation that it possessed only an easement.

The M & R recognized that, even where an equitable fee is possessed, such an interest is capable of being destroyed by the owner's abandonment. *Jennisons v. Leonard,* 88 U.S. 302, 309, 22 L.Ed. 539 (1875). However, such acts of abandonment must be accompanied by positive and unequivocable acts expressing an intent to abandon the right in question. The mere passage of time, unaccompanied by such acts will ordinarily be insufficient to find waiver or abandonment. *Hairston v. Bescherer,* 141 N.C. 205, 208, 53 S.E. 845 (1906) (quoting *Falls v. Carpenter,* 21 N.C. 237 (1835)).

Although the United States argues that the railroad's conduct evidenced only an intent to hold an easement, the M & R correctly observed that the act of running trains along a right-of-way is equally consistent with both a fee interest and an easement. *See Craig v. Southern R. Co.,* 262 N.C. 538, 138 S.E.2d 35 (1964) (per curiam) (deed conveying fee simple for railroad right-of-way). The magistrate judges were also persuaded that evidence that the railroad attempted to sell the property, even after abandoning rail service, was sufficiently indicative of an intent to possess in fee to render summary judgment inappropriate.

It is true that the railroad's position in this action has been that it only possessed an easement. However, for a several reasons, this is not persuasive. To begin with, these representations come at a time after the railroad had divested itself of all interest in

the property. The government has pointed to no authority demonstrating that a *former* owner's representation plays any role in determining waiver or abandonment. Indeed, logic dictates that only the actions of one currently possessed of an interest can constitute an abandonment.

Furthermore, the magistrate judges reviewed the railroad's previous actions concerning the property. The railroad attempted to sell the property forming the basis of this action to the United States, prior to its sale to Dunbar. Previously the railroad succeeded in selling another portion of its right-of-way over the former Murchison lands to the United States. This land was adjacent to Pope Air Force Base and the United States accepted a quit-claim deed from Seaboard describing it as "a part of the same land conveyed from D. Murchison to Western Railroad Company by deed dated October 15, 1853." Memorandum and Recommendation at 24–25.

Certainly these actions support an inference that the railroad believed that it owned the property and that it could convey it. Had the railroad truly believed that it possessed nothing more than an easement, it would have realized that any interest that it had would revert to adjacent landowners. Such a belief would also mean that its sale to the United States would be at, at a minimum, highly unethical, if not bordering on fraud. While such actions are certainly not unknown, this court should not presume that a sophisticated entity, such as the railroad, would engage in such conduct against the federal government. Absent such a presumption, summary judgment was clearly inappropriate on the question of waiver or abandonment of a potential fee interest. The government's objections on this point are overruled.

### 9. *Statutes of Limitations and Laches*

The government has argued that any enforcement of the 1853 contracts has long since been barred by the railroad's failure to obtain a deed. It is contended that the passage of over a century bars enforcement of the agreement either by application of a statute of limitations, or through the equitable doctrine of laches. The magistrate judges concluded that the railroad's actual possession of the equitable estate was sufficient to prevent the running of any applicable statute of limitations or laches.

The M & R attempts to trace the various potentially applicable statutes of limitations, and they need not be recited again here. It notes that it is not clear which statute of limitations applies. While North Carolina has long had a three year period for breach of contract actions, it has also had ten year statutes of limitations covering a variety of potential claims. The Revised Code of 1855 contained a provision for "[t]he presumption of payment, or abandonment of the right of redemption on mortgages and of other equitable interests ..." after ten years. Rev. Code, Ch. 65 § 19 (1855). Chapter 65 was repealed by the time of the 1868 Code of Civil Procedure, although it would have applied to actions that had already accrued. As observed by the M & R, later ten year statutes often did not expressly cover claims on a general class of "equitable interests." Memorandum and Recommendation at 97 n. 35. However, North Carolina currently provides a ten year period for all actions which have not specifically been provided for. N.C.GEN.STAT. § 1–56. Although the magistrate judges found that the railroad was in place by 1872, there still remains uncertainty as to the precise date of its completion. This certainly affects which statute applies, and I am not persuaded by the apparent argument that certainly some statute of limitations has run by now, making a discussion of specific statutes irrelevant.

The M & R rested its decision on cases and other authority to support the proposition that an equitable estate cannot be lost by laches or a statute of limitations while the vendee is in possession. *Solon Lodge Knights of Pythias Co. v. Ionic Lodge Free Ancient & Accepted Masons*, 247 N.C. 310, 318, 101 S.E.2d 8 (1957); 77 Am.Jur.2d, *Vendor and Purchaser* § 318 (1985). Over the years, courts have addressed different statutes of limitations and have at least noted the potential for an exception, particularly through possession.

In *Headen v. Womack*, 88 N.C. 468 (1883), the court examined Rev.Code ch. 65 Sec. 19, presuming the abandonment of equitable interests. Although the court referred to this as a "statute of repose," it also stated that it was "a question of law for the court, what circumstances, if true, are sufficient to repel the inference created by the lapse of time under the statute." 88 N.C. at 470. The *Headen* court determined that, contrary to there being any fact to repel the inference of abandonment or satisfaction of an equitable interest, the facts showed an actual abandonment. In *McAden v. Palmer*, 140 N.C. 258, 52 S.E. 1034 (1905), an action to recover damages for cutting timber where the defendants were found to have trespassed, the defendants asserted a claim in equity to have the plaintiff declared trustee of the legal title for them. The court found the claim to be barred under Code section 158, providing that an action for relief, not otherwise provided for, must be commenced within ten years of accrual. Significant, however, was the court's comment that "[d]uring these thirty-eight years there is no evidence of any possession upon the part of the defendants or those under whom they claim." 140 N.C. at 259–60, 52 S.E. 1034.

At this juncture, the court does not intend to explore every conceivable statute of limitation, and exception, that might have applied over the past century. Of course, the precise applicable statute might be ascertained through further historical research into the railroad's construction. It is enough for now to say that sufficient questions of fact exist to make summary judgment on this question improper.

It is true that, while possession might generally save an action otherwise barred by laches or a statute of limitations, these authorities likely did not contemplate an occupancy of the subject property for well over a century. However, assuming *arguendo* that either limitations or laches would currently bar an action to specifically enforce the contract, this would not necessarily affect the outcome of the M & R. As previously discussed, the fundamental premise of the M & R is that the railroad's occupation of the property, following full performance, resulted in a perfection of the title, making current discussions about specific performance irrelevant. Given this fact, and in the interests of brevity, it will be more fruitful to examine the issue of perfection of title, rather than engaging in a speculative discussion over the applicability of either limitations or laches.

10. *Adverse Possession*

The M & R's ultimate result, finding that the railroad possessed a fee interest in the subject property, derives from a finding of adverse possession thereby perfecting the railroad's title. It relies heavily on *Avent v. Arrington*, 105 N.C. 377, 10 S.E. 991 (1890), and, similar authorities, to show that this result derives from the railroad's interest under a contract to convey a fee interest. While these authorities need not be discussed at length here, they may be summarized as follows. Under this analysis, where a vendee enters into possession under an executory contract to convey, his possession is deemed adverse to all others, except his vendor. However, upon full performance and payment of the purchase price, the vendee's possession becomes adverse to the vendor.

The United States has first objected that this decision was on an issue not briefed or argued. However, the magistrate judges correctly observed that a claim of adverse possession was originally put forth by Dunbar as a basis for its title claim. The fact that the parties did not engage in briefing or argument certainly does not tie the court's hands when confronted with a potentially dispositive point. This objection is overruled.

It is also objected that the railroad's use of the property as a right-of-way is not sufficiently open and notorious to constitute a claim of fee ownership. The government argues that this use would, at most, constitute a prescriptive easement. The right-of-way use would simply not be sufficiently hostile to the "true owners" to make them aware that the railroad claimed exclusive use of the property. The United States also contends that the M & R's observation that railroad's use of the property was equally consistent with a fee or easement interest is incorrect, from an adverse possession point

of view, and that the possession was neither hostile nor exclusive as to the "true owners."

The M & R has clearly shown that a right-of-way can be held as either an easement or a fee. Thus, its use of the property is equally consistent with either interest. While the United States would otherwise be correct, that such use normally would give rise only to a prescriptive easement, the existence of the contract changes the result. Under the M & R's analysis, the contract plus full performance, changes the quality of the railroad's possession. As previously discussed, the very fact of the railroad's possession would have required that subsequent purchasers make inquiry as to the interest claimed by the railroad. Had such inquiry been made, the equitable fee would have been disclosed. The United States has offered no authority sufficient to rebut the magistrate judges' analysis on this point.

Additionally, while the government claims that the railroad's possession was neither hostile, nor exclusive, *vis-a-vis* the "true owners," it offers no evidence to support this. No one has disputed the fact that the railroad laid tracks on the property and ran trains across it. There is nothing in the record to show that any other person made use of the property in any fashion. Absent such evidence, conclusory statements concerning the quality of possession are not sufficient. The government's objections are overruled.

The government also objects to the discussion of the 1853 documents as color of title. However, there is no need to consider this argument. While the existence of color of title might shorten the applicable period of possession, the railroad clearly possessed the property for a sufficient period either with, or without, color of title. Furthermore, this would have occurred prior to the acquisition of any interest by the United States.

However, it is clear that the magistrate judges' analysis of "perfection of title," through possession following full performance, hinges upon their determination that the 1853 contracts contemplated the conveyance of a fee interest. This point constitutes the linchpin of the M & R's analysis, and it is to that which the court now turns.

11. *Nature of the 1853 Documents and the Interest of the Railroad*

The magistrate judges determined that the 1853 documents were option contracts, which became contracts to convey following the railroad's placement of its tracks on the property. The interest to be conveyed was that of a fee simple. In determining the nature of the interest conveyed, the magistrate judges relied on a long line of case authority concerning conveyances to railroads and the construction given to deeds. While these authorities are fully set forth in the M & R, and need not be reviewed here, they establish a general rule that where a conveyance speaks in terms of conveying "land," a fee interest is intended. Conversely, when the conveyance refers to a "right-of-way," or some other "right" in land, the intent is to convey only an easement. The cases also reflect the difficulty when these terms are intermixed in the conveyance. *See generally* Annotation *Deed to Railroad Company As Conveying Fee or Easement,* 6 A.L.R.3d 973 (1966). In this case, the 1853 documents refer to the grantor's intent to convey "a sufficient quantity of land." The M & R viewed the documents' language that the railroad should "locate their Road through or upon the lands of the undersigned," as being descriptive, and not a limitation on the quality of the estate being conveyed.

The government has filed numerous objections to this conclusion. Many of these, concerning the documents' age, sufficiency of description, time for performance, etc., have been previously dealt with. The remaining objections concern the M & R's consideration of cases involving deeds, application of the rules of contract construction, and purported public policy consideration.

The government objects to the M & R's consideration of whether the 1853 document could be considered a deed. While the magistrate judges determined that the parties were correct in their assessment of the document's status as a contract, it was not error to assess the possibility that it could be a deed. The evidence before the court, partic-

ularly that concerning Seaboard's previous sale to the United States, had referred to a "deed" from Duncan Murchison. It was therefore prudent to ascertain the precise status of the document. This objection is overruled.

Both the State and the United States have urged the court to construe the document as contemplating only an easement based on public policy considerations. The government entities first rely on the Abandoned Railroad Easement Act, N.C.GEN.STAT. § 1–44.2. They have also referred the court to a 1985 state court action, *The State of North Carolina, ex rel. Lacy H. Thornburgh, Attorney General v. Seaboard, et al.,* 85–CVS–6185 (Wake County), in which the State attempted to stop Seaboard from quitclaiming abandoned railroad rights-of-way to third parties. It is argued that the Act, and the legal action against Seaboard, represent North Carolina public policy finding such rights-of way to be held only as easements. This argument is not persuasive for several reasons.

First, it is clear that the Abandoned Railroad Easement Act applies only to easements, and not to fee interests. *McLaurin v. Winston–Salem Southbound Railway Company,* 323 N.C. 609, 374 S.E.2d 265, 267 (1988). Similarly, as noted by the M & R, the *Thornburgh* action was settled in 1987, but that the complaint there only attempted to stop Seaboard from quitclaiming deeds to rights-of-way held only as easements for railroad purposes. It did not prevent Seaboard from disposing of property held in fee.

The M & R has correctly observed that North Carolina recognizes that a railroad right-of-way can be held in fee simple. Neither the Abandoned Railroad Easement Act, nor the *Thornburgh* action, constitute the type of public policy statements, concerning construction of rights-of-way, that would prevent the court from finding that such a strip of land could be held in fee. *Compare* Memorandum and Recommendation at 61 n. 25 (public policy statements of Indiana and California). Neither authority prevents either a railroad, or one claiming under it, from arguing that it possesses a fee. Certainly where it is otherwise clear that a fee interest is

possessed, these authorities will not suffice to deprive an individual or entity of its property interest. Furthermore, while both the State and the United States contend that construction of these documents as contracts for a fee will have an unsettling effect on countless parcels of land, such concerns seem largely speculative at this point. These objections are overruled.

The North Carolina Supreme Court has observed that "a railroad corporation is without power to acquire and hold real estate except by statutory authority, either expressly conferred or necessarily implied from the powers contained in its charter or arising to it under the General Laws." *N.C. State Highway Commission v. Farm Equipment Co.,* 281 N.C. 459, 189 S.E.2d 272, 279 (1972) (quoting *Wallace v. Moore,* 178 N.C. 114, 115, 100 S.E. 237, 238 (1919)). Railroads, and particularly those chartered in the nineteenth century, typically acquired property through three methods: (1) purchase; (2) condemnation; or (3) in the absence of a written contract, a presumption of a grant following entry onto the land, and the owner's failure to bring an action for damages. *Barker v. Railroad,* 137 N.C. 214, 220–21, 49 S.E. 115 (1904). Both condemnation and the presumption of a grant, are construed as giving only an easement for railroad purposes. *N.C. State Highway Commission v. Farm Equipment Co.,* 189 S.E.2d at 280 (condemnation); *R.R. v. Sturgeon,* 120 N.C. 225, 230, 26 S.E. 779 (1897) (presumptive grant). However, neither of these two methods can be seen as applying here. There is no evidence that the railroad ever condemned this property, and a written contract exists concerning its entrance onto the property.

While the magistrate judges relied heavily on cases concerning deeds to railroads, there do not appear to be a large number of cases interpreting documents that are clearly only contracts, or agreements, for the construction of railroad rights-of-way. The magistrate judges noted the case of *Corning v. Lehigh V.R. Co.,* 217 N.Y.S.2d 874, 14 A.D.2d 156 (1961) in which an equitable fee was conveyed to the railroad. In *Corning,* the railroad acquired the disputed property by entering into an agreement with one Daniel

Valentine. The agreement was dated "July __ 1867." It was under seal and recited:

> The said Daniel Valentine, in consideration of the sum of one dollar to him in hand paid, the receipt whereof is hereby acknowledged, hereby promises and agrees to and with the said Railroad Company to grant and convey to said Company, free of encumbrance and by a good and sufficient deed, all the land that said Company may require for the construction and convenient use of their Railroad, upon and across the lands of said Daniel Valentine, along the Lake Shore, situated in the town of Genoa, County of Cayuga, in the State of New York, and being a part of Lot No. 22 whenever said Company shall have finally built their Railroad ... and a deed conveying the same.

217 N.Y.S.2d at 877. The contract contained a notation that it was conditioned on the railroad's construction of a station at "Atwater Landing." The contract was not recorded until October 11, 1879. The railroad never obtained a deed for the property, but entered under the contract and built the railroad by 1871. The railroad operated across the property until sometime in the 1950's when service was discontinued.

Subsequent purchasers acquired parcels of land out of the Valentine farm and sought a judgment that they owned the railroad property in fee. The railroad opposed, contending that it was the fee owner. The appellate court agreed with the railroad stating:

> The description in the agreement was sufficiently definite to vest in the railroad company ownership of the strip of land occupied by it under the agreement (*Lipton v. Bruce*, 1 N.Y.2d 631, 154 N.Y.S.2d 951, 136 N.E.2d 900). The proof upon the trial established the precise width of the strip of land occupied by the railroad.
>
> As has been stated, it is undisputed that under the language of the agreement, Valentine was bound to convey a fee to the railroad company. In the absence of a deed, the interest of the railroad company was that of the owner of an equitable fee, since the agreement was one which was specifically enforcible (sic) by the railroad company, after it had made expenditures

in reliance thereon and had built the railroad in accordance with the terms of the agreement (Restatement of Contracts, §§ 366, 372; 5 Williston, Contracts [rev. ed.] § 1439; cf. *Epstein v. Gluckin*, 233 N.Y. 490, 135 N.E. 861).

*Id.* 217 N.Y.S.2d at 878.

The Fourth Circuit addressed a right-of-way contract in *Lockwood v. Ohio River R. Co.*, 103 F. 243 (4th Cir.1900), *cert. denied*, 180 U.S. 637, 21 S.Ct. 920, 45 L.Ed. 710 (1901), a case arising out of West Virginia. There the railroad entered into an "agreement" with a landowner, Jesse Pugh. Its terms provided that the railroad intended to construct its line through the county; the contract was made in consideration of the advantages that the railroad would be to Pugh and his property, and for the railroad's promise to make a crossing where Pugh's private road crossed the railroad, and to put up cattle stops where appropriate. 103. F. at 243. It recited that:

> the said Jesse Pugh does hereby grant and convey unto the said [railroad] the full and free right of way, of the width of fifty feet ... which right of way is hereby granted and conveyed for the construction, building and use of the road of said company ... and the said Pugh does hereby covenant and agree to execute and acknowledge in due form of law, when required by said company, a deed conveying to said company in fee simple, the said land hereinbefore described.

103 F. at 243–44.

The agreement was executed on April 10, 1882, and was recorded on January 5, 1884. In 1888, Jesse Pugh conveyed his entire tract containing the land where the railroad was located to A.N. Pugh. On May 31, 1898, A.N. Pugh entered a mineral lease with Stephen Lockwood. On August 18, 1898, the railroad entered into a mineral lease with Samuel Logan. In 1898, the railroad made its first demand for a fee simple conveyance from A.N. Pugh, which was refused. No such deed was ever executed.

In a challenge to the railroad's interest in the mineral rights brought by Lockwood, it was argued that the railroad only possessed

an easement, and therefore no interest in the mineral rights. After examining the circumstances surrounding the contract, the court determined that the railroad intended to receive only a right-of-way, stating that "[t]his instrument, although called an 'agreement' is signed only by Jesse Pugh, and in its essential elements, it is nothing more than a deed of conveyance to the railway company of the right-of-way therein described." 103 F. at 247. It was recorded, and the railway company entered into, and remained in, possession of the property under this instrument alone, no further deed being sought for sixteen years. The court found a right-of-way to be all that the railroad had bargained for. *Id.*

In *Beattie v. R.R.*, 108 N.C. 425, 12 S.E. 913 (1891) plaintiff's predecessor in title, William Cabiness, executed an agreement with the railroad on October 27, 1855 which stated:

> This indenture witnesseth, That we, whose names are hereunto subscribed, do hereby relinquish to the Wilmington, Charlotte & Rutherford Railroad Company the right of way for said road through all and every piece or parcel of land respectively owned by us, severally, in the county of Cleveland, and we do this in consideration of the prospective advantage which may accrue to us, arising from the road's location through our county.

108 N.C. at 426–27, 12 S.E. 913. The railroad began the location of its track, and performed a portion of the grading. However, there was a suspension of work for at least twenty-five years, whereupon the railroad finally completed the track. During this period of suspension, Cabiness conveyed the land to the plaintiff, who cultivated the land over which the location had been made for seventeen years, until the railroad re-entered the premises. The court ruled that the railroad's delay constituted an abandonment of the earlier contract and that plaintiff could now seek compensation for the taking of his land.

As part of its consideration, the *Beattie* court analyzed the significance of the agreement between Cabiness and the railroad.

Passing over the question whether the description in the contract offered as evidence of title by the defendant was too vague to be enforced after it was executed, or admitting, for the sake of argument, that it was sufficiently definite because its location could be made certain by a survey, which was contemplated by the parties in entering into the agreement, we must still bear in mind the fact that the paper-writing is not a deed, because it is not sealed and wants apt legal words to make it an effectual conveyance of an interest in land. At the time of its execution it could have been construed in the most favorable view for the company only as an executory contract to convey the right of way whenever the road should be located and finished over the land of Cabiness.

*Id.* at 430, 12 S.E. 913. The decision, however, goes on to demonstrate that the court viewed the interest contemplated as being an easement.

Under the analytical framework proposed by the magistrate judges, it might be seen that the documents in both *Lockwood* and *Beattie* specifically use the term "right of way," and this can be said to support the ultimate decision that the interest intended was only that of an easement. However, *Lockwood*, when faced with a document that used the both the terms "fee simple" and "right of way," also looked at the subsequent conduct of the parties in order to determine what the railroad had actually bargained for.

As the M & R correctly sets forth, while railroads can hold property used as a right-of-way in fee, determining what interest is actually acquired depends on ascertaining the intent of the parties. Memorandum and Recommendation at 59. This is determined by analyzing the entire instrument, and construing it in light of the company's charter and, where necessary, the surrounding circumstances. *Id.* (citing *Rogers v. Pitchford*, 181 Ga. 845, 184 S.E. 623 (1935)). Similarly, rules of contract interpretation focus on the intention of the parties. *Jones v. Palace Realty Co.*, 226 N.C. 303, 305, 37 S.E.2d 906 (1946). Ambiguities in a contract must be resolved by the trier of fact by considering a number of factors including "the expressions

used, the subject matter, the end in view, the purpose and the situation of the parties." *International Paper Company v. Corporex Constructors, Inc.,* 96 N.C.App. 312, 385 S.E.2d 553, 556 (1989). Of course, in a Quiet Title Act case, such as this, the court acts as the finder of fact.

The court has considered a number of factors, including rules of contract construction, the railroad's charter, and the subsequent conduct of the parties following execution of the contract. While I am appreciative of the logic underlying the magistrate judges' determination that a fee interest was intended, I disagree with the emphasis placed on certain factors. Admittedly this case can be approached in several ways, and it may be that the next court to view it will take a different view. However, I find that the proper construction of the 1853 contract demonstrates that only an easement was contemplated.

To begin with, I find this contract to be ambiguous. While speaks of conveying "a strip of land," it also mentions that the land is for a "Road," running "through or upon" the lands of the grantor, and measures the property from the center of the "roadbed." While use of the term "land" may be consistent with a fee, the latter terms are more consistent with an easement. Since the contract is capable of more than one interpretation it is ambiguous, and must be construed under the established principles of contract construction.

Dunbar has premised many of its contentions on the fact that the railroad's charter permitted it to hold land in fee. In fact, the relevant charter provision states:

> That the said company may purchase, have and hold in fee or for a term of years any land, tenements or hereditaments which may be necessary for the said road, or for the erection of depositories, storehouses, houses for the officers, servants or agents of the company, or for work-shops or foundries to be used by the company, or for procuring stone or other material necessary to the construction of the road, or effecting transportation, and for no other purpose whatever.

Chapter 147, Section 15, Laws of 1852. While the charter does allow fee possession, it limits the purpose for which the property can be held.

Of course, railroads have been recognized as having the power to sell land held in fee, even if it is for a non-railroad purpose. *McLaurin v. Winston–Salem Southbound Railway Company,* 374 S.E.2d at 268. Furthermore, even if a particular action of a railroad in disposing of such property were *ultra vires,* only the State would have standing to object. *Mallett v. Simpson,* 94 N.C. 37, 41 (1886). The State has not contended here that, even if Seaboard held a fee, its sale to Dunbar should be set aside as contrary to the railroad's charter authority and that proposition need not be further considered. However, regardless of the potential outcome of such an action, this charter limitation still provides an important key to be considered in ascertaining the parties' intent.

I have also given some weight to the vagueness of the description contained in the contract. While it has been determined that the contract is not completely unenforceable, due to a statute of frauds violation, this does not prevent consideration of the description as evidencing the parties' intent. In this regard, I find the description here to be analogous to those cases involving a "floating right-of-way," and therefore indicative of an easement. *See* Memorandum and Recommendation at 50.

The railroad's subsequent conduct throughout the majority of its period of occupation, while not uniform, is also more indicative of an easement than a fee. As a general rule, contracting parties are presumed to know the intent of their contract and, where they have placed a practical interpretation on it, that will normally be given effect in the court's construction. *E.g., Preyer v. Parker,* 257 N.C. 440, 125 S.E.2d 916 (1962). Here the railroad occupied the property for well over a century and neither sought a deed, recorded its contract, nor took any further step to perfect a fee interest. This conduct is consistent with similar conduct noted in *Lockwood* where the court determined that the railroad had only bargained for an easement.

It is also instructive to consider that at the time of execution, and for over thirty years thereafter, there were statutes requiring registration of contracts to convey. Indeed, as previously discussed, former Code § 1245 might have barred the admission of these contracts into evidence, had an action been brought prior to 1885. This court has previously determined that the failure to register the contract does not bar Dunbar's claim. However, this result comes after a century of hindsight and in light of the changes that have been wrought in the law decades after the execution of the 1853 contracts. Certainly the railroad would have been aware of the changes in the law and might have concluded that a time might come when the Legislature would fail to extend the time for registration. Prudence would dictate registration of the contracts, if it truly intended to preserve a fee interest.

Of course, from the railroad's point of view either a fee or an easement would serve its purposes equally well. As long as it simply ran trains over the right-of-way it was protected by statute, and no party could have adversely possessed against whatever interest it held. Quite likely the railroad did not give any further thought to the precise interest that it held.

It is true that recent developments give conflicting views as to the railroad's construction of the contract. The United States has criticized the M & R for failing to give consideration to the railroad's current position that it only possessed an easement. Dunbar, of course, can point to the railroad's attempts to sell the property, both to Dunbar and the United States.

For reasons that have been previously explored, the railroad's current representations on the status of its interest are entitled to little weight. Under different circumstances, the act of attempting to sell the property, even through quitclaim deeds[2], might be more persuasive. However, these actions occurred over a century after the execution of the 1853 contract. Under the circumstances here, I find it more appropriate to examine

the railroad's actions closer in time to the contract's execution, as being representative of the intent of the parties. This is certainly fairer, given the fact that the railroad is a corporate entity, capable of perpetual existence, and could otherwise effect contractual modifications simply by outliving the natural persons with whom it contracts.

Finally, I have considered the fact that the Murchison and McCormick documents are essentially identical which leads to the inescapable conclusion that they were prepared by the railroad. Ambiguities in written contracts are typically construed against the party who prepares the writing. E.g., Jones v. Realty Co., 226 N.C. at 305, 37 S.E.2d 906. While the railroad might well be capable of holding right-of-way property in fee, it is not an inordinate requirement that such an interest be unambiguously expressed. This is even more compelling given the railroad's relative position as a sophisticated corporate entity. The United States' objection on this point is therefore well taken.

I therefore find that the railroad contracted only for an easement for railroad purposes across the lands of Duncan Murchison. Upon abandonment of railroad service, the land reverted to the adjacent landowners under both the Abandoned Railroad Easement Act and common law principles. The United States was an adjacent landowner at the time of this abandonment. Furthermore, since it is not disputed that a public highway bounded the property on the other side, the United States obtained the fee interest underlying the entire former right-of-way. Title should therefore be quieted in the United States for all property that remains in dispute, being the condemnation property and the ".46 acre" tract.

12. *Remaining Issues, Injunctive Relief, and Interlocutory Appeal.*

Given the determination that the United States owns the fee simple for the disputed parcels, the state condemnation action would constitute a cloud on the government's title. Several forms of equitable re-

---

2. The use of a quitclaim deed does not automatically raise an inference that the railroad did not believe that it owned the property. Given the

state of the title, the railroad might prudently wish to avoid giving any type of warranty on the conveyance.

lief have been proposed, including requiring the State to dismiss the condemnation action; removal to this court, followed by dismissal; and, a permanent injunction against further proceedings in the state court. I find the last remedy to be appropriate. Given the history of this litigation, and the likelihood of an appeal, a permanent injunction will preserve the status quo of the state court action until the Fourth Circuit has had a chance to address these issues. Should that court reach a different result, the injunction could then be lifted and the matter allowed to proceed. The Anti–Injunction Act, 28 U.S.C. § 2283, does not constitute a bar to this course of action, since the United States is the party requesting a stay of the state proceedings. 17 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4222 (1988).

Although the issue of title has been resolved, questions still remain concerning the United States' claim concerning entitlement to condemnation proceeds that may have already been disbursed. The United States has been allowed to amend its complaint on this point, but further discovery and briefing may be warranted. The parties will be given an opportunity to address this issue.

Despite the number of issues that have been addressed and determined to date, it is apparent that there are still issues to be resolved in this matter. However, precisely what those are will ultimately depend on whether this court's determination as to the title of the condemnation property stands. At this point, the United States is determined to be the fee owner of the disputed parcels and the only remaining issue for further decision is its claim concerning condemnation proceeds. Should an appeal result in a ruling that the M & R's analysis was substantially correct, two significant changes will occur. First, the United States' claim for proceeds will likely have to be dismissed, since Dunbar will be entitled to a condemnation award. Second, the court will have to address the issue of whether the railroad's deed to Dunbar actually encompassed the ".46 acre" tract that remains a subject of dispute between CSX and McCauley and McDonald.

These concerns demonstrate the pivotal role played by the determination of title. As demonstrated by the different results between the M & R and this order, there are certainly substantial grounds for a difference of opinion on these questions. It may be that these issues are appropriate for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). However, it is not my intent to *sua sponte* certify this order. Given the length and complicated nature of this case, the better course is to allow the parties the opportunity to consider whether they wish to undertake an appeal at this time. It may be that they wish to let this order stand, or otherwise settle the remaining issues. Should any party desire an interlocutory appeal they may move for certification.

### SUMMARY AND ORDER

It is therefore ORDERED that:

1. The United States Motion for Summary Judgment against Dunbar Corporation, filed June 30, 1989, and Renewed Motion for Summary Judgment Against Dunbar Corporation, filed June 13, 1991, be GRANTED solely as to any issues concerning title to the disputed property.

2. That Dunbar Corporation's Motion for Summary Judgment against the United States be DENIED.

3. That the United States Motion for Summary Judgment Against the State of North Carolina, filed June 13, 1991, be GRANTED.

4. That CSX' Motion for Summary Judgment Against McCauley and McDonald, filed March 26, 1990 be GRANTED.

5. That title to the tracts currently the subject of the state condemnation action *Department of Transportation v. Seaboard System Railroad, Inc.*, No. 84–CVS–3367 (Cumberland County) be quieted in the United States of America in fee simple absolute.

6. That the State of North Carolina, Department of Transportation and Dunbar Corporation be permanently enjoined from further proceedings in the state condemnation action.

7. That title to the property described as the ".46 Acre" tract be quieted in the United

 

States of America in fee simple absolute, subject to an easement for railroad purposes in CSX Transportation, Inc. or its successors in corporate interest.

8. That the United States of America, the State of North Carolina, and Dunbar Corporation have a period of thirty (30) days from the date of this order to provide the court with a proposed scheduling order for the disposition of the United States' claim of entitlement to a percentage of any condemnation proceeds that have been previously disbursed in the state condemnation action.

9. That any party desiring an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) shall move this court for certification within twenty (20) days of the date of this order. Such motion shall automatically stay any further proceedings in this matter.